MYERS, P.J.,
 

 for the Court:
 

 ¶ 1. The Rankin County Chancery Court awarded legal and physical custody of C.H.,
 
 [1]
 
 a minor child, to her father, Joseph R. McDaniel, based on a finding that a material change in circumstances had occurred since its previous judgments that warranted changing C.H.’s custody from her mother, Teressa C. Curry. Curry appeals. Finding no reversible error with the chancery court’s judgment, we affirm.
 

 FACTS
 

 ¶ 2. In November 2001, McDaniel and the Mississippi Department of Human Services (DHS) entered into a stipulated agreement of paternity in the Rankin County Chancery Court, and McDaniel was adjudicated the natural father of C.H., a child born out of wedlock to Curry in March 2001. The paternity judgment was silent as to custody. In March 2007, based on information that Curry had plans to move to Tennessee with C.H., McDaniel filed a complaint in the chancery court in which he requested the court to set child support in an amount to be deducted from his wages, secure his visitation rights, amend C.H.’s birth certificate to reflect McDaniel’s surname, and provide other relief. Curry filed a cross-complaint for child custody and support. On May 8, 2007, the parties entered into a stipulated agreement to allow for a family master to hear the matters pertaining to “child custody, child support, name change, and visitation.” On June 21, 2007, Curry and McDaniel entered into an agreed order establishing child support, visitation, name change, and related relief which was approved by the family master and affirmed by the chancellor. The order, however, was silent as to custody. In November 2007, DHS also filed a complaint in the Rankin County Chancery Court against McDaniel, seeking past and future support of the child, a withholding order, and health insurance.
 

 ¶ 3. In December 2007, McDaniel filed a petition in the Rankin County Chancery Court charging that a material change in circumstances had occurred since the court’s June 2007 decree was entered and that the change adversely affected the safety and welfare of C.H. Two evidentiary hearings were held in the matter, the first on September 4, 2008, and the second on February 12, 2009. The only witnesses who testified at the hearings were Curry, McDaniel, and McDaniel’s wife of one
 
 *1228
 
 year, Yolonda McDaniel. Yolonda and McDaniel had lived together for three years prior to their marriage, and Yolonda has known McDaniel and C.H. for four years. Curry is also married. She and her husband married in April
 
 2008.
 

 ¶ 4. On March 11, 2009, the chancery court issued a judgment finding that since rendition of the past final judgments in this cause, a material change in circumstances had occurred which warranted the court changing custody of C.H. from Curry to McDaniel. Taking into consideration
 
 Tucker v. Tucker,
 
 453 So.2d 1294 (Miss.1984) and
 
 Albright v. Albright,
 
 437 So.2d 1003 (Miss.1983), the court held that it was in the best interest of C.H. that custody be changed, and the court awarded legal and physical custody of the minor child to McDaniel. The court granted Curry liberal visitation rights and held that due to Curry’s health and unemployment, she would not be required to pay child support.
 

 ¶ 5. Curry appeals asserting the following assignments of error:
 

 I. The chancellor committed manifest error in not treating this case solely as one for modification of custody.
 

 II. Had the chancery court used the proper standard of modification, McDaniel would not have prevailed.
 

 III. The chancellor committed manifest error in considering testimony he had previously found inadmissible.
 

 IV. The chancellor’s consideration of evidence pertaining to Curry’s disability was discriminatory and in violation of the spirit of federal law.
 

 V. The chancellor’s
 
 Albright
 
 analysis was fatally flawed.
 

 STANDARD OF REVIEW
 

 ¶ 6. “The matter of child custody is a matter within the sound discretion of the chancellor.”
 
 Sturgis v. Sturgis,
 
 792 So.2d 1020, 1023 (¶ 12) (Miss.Ct.App.2001). In reviewing the award of child custody, this Court will affirm the decision of the chancellor unless that decision is manifestly wrong, clearly erroneous, or the chancellor applied an erroneous legal standard.
 
 Roberson v. Roberson,
 
 814 So.2d 183, 184 (¶ 3) (Miss.Ct.App.2002). “[F]indings of fact made by a chancellor may not be set aside or disturbed upon appeal if they are supported by substantial, credible evidence.”
 
 Marascalco v. Marascalco,
 
 445 So.2d 1380, 1382 (Miss.1984) (citations omitted).
 

 DISCUSSION
 

 I. The chancellor committed manifest error in not treating this case solely as one for modification of custody.
 

 II. Had the chancery court used the proper standard of modification, McDaniel would not have prevailed.
 

 ¶ 7. Curry contends that chancellor erroneously treated this case as an initial-custody matter, rather than as one for custody modification. Curry submits that the chancellor acknowledged that she has had de facto custody of C.H. for most of C.H.’s life, and despite the chancellor’s decision to award McDaniel custody of C.H. based on a material change of circumstances, the chancellor did not seriously consider this case to be a modification case. Curry contends that the chancellor gave short shrift to the material-changes requirement and proceeded directly to a best-interest analysis under
 
 Albright.
 

 ¶ 8. Prior to issuing his final ruling, the chancellor provided a detailed discussion from the bench following the close of evidence in the case and explained to the parties what the law mandates in cases where a party is seeking modification of a
 
 *1229
 
 previous-custody determination as compared to an initial-custody determination. The chancellor pointed to the case of
 
 Tucker,
 
 wherein the supreme court reiterated that:
 

 A decree for child custody shall not be modified so as to change custody from one parent to the other unless, subsequent to the original decree, there has been a material change in circumstances under which the child is living with the custodial parent which adversely affects the child’s welfare.
 

 Tucker,
 
 458 So.2d at 1297 (citations omitted). The chancellor explained that even if the court finds a material change in circumstances has occurred and the change has adversely affected the child, the court still must determine whether it is in the best interest of the child to change custody: always keeping in mind, the best interest and welfare of the child are the polestar considerations.
 
 See id.
 
 (citing
 
 Denney v. Denney,
 
 453 So.2d 693, 694 (Miss.1984)).
 

 ¶ 9. The chancellor found in this instance that there had been no custody determination decided or approved by the court pri- or to McDaniel’s petition for custody modification. Because there had not been a first-time finding by the court regarding custody of C.H., the chancellor viewed this matter as a “straight custody case.” The chancellor explained that when there has been no previous custody determination, a material-changes test is not required; rather, Mississippi law instructs chancellors to apply an
 
 Albright
 
 analysis in order to determine in whose custody does the best interest of the child lie. He stated, however, that even if there had been a prior custodial award by the court, a material change in circumstances adversely affecting the welfare of C.H. was sufficiently demonstrated to the court. The chancellor articulated his reasoning as follows:
 

 The [court] finds in this particular case, even arguendo, if there had been a prior custodial award by a [court] that in this particular case under the circumstances, and those circumstances, I’m talking about negative hygiene issues with this little girl while she has been with the mother; an academic failure, failure to make academic progress under parental attention. This instance of endangerment to the child or potential danger to the child resulting from driving recently without a driver’s license and with impaired vision, all of those things in their totality would equate with a material change of circumstances adverse to the child which would adversely affect, potentially, the health of the child.
 

 ¶ 10. This Court has held that “the material[-]changes standard used in modification proceedings is dependent on there being a prior determination of custody.”
 
 C.W.L v. R.A.,
 
 919 So.2d 267, 271 (¶ 10) (Miss.Ct.App.2005) (quoting
 
 Law v. Page,
 
 618 So.2d 96, 101 (Miss.1993)). But, in cases where no prior determination of custody has been considered, “the proper standard of law to be applied is that found in divorce proceedings, which is the best interest of the minor child.”
 
 Id.
 
 (citations omitted). Once the father of a child born out of wedlock acknowledges the child as his own, “the father is deemed on equal footing with the mother as to parental and custodial rights to that child.”
 
 Williams v. Stockstill,
 
 990 So.2d 774, 776 (¶ 9) (Miss.Ct.App.2008) (citing
 
 Smith v. Watson,
 
 425 So.2d 1030, 1033 (Miss.1983)). This Court has further held that “there is no law to support a different burden of proof for fathers of children born out of wedlock who delay in seeking custody[;][t]he law is that unless a prior custody determination has been made, custody is determined by the
 
 Albright
 
 factors.”
 
 Id.
 
 at 776 (¶ 8) (citing
 
 Law,
 
 618 So.2d at 101;
 
 Romans v.
 
 
 *1230
 

 Fulgham,
 
 939 So.2d 849, 852 (¶ 4) (Miss.Ct.App.2006);
 
 C.W.L., 919
 
 So.2d at 271 (¶ 10);
 
 S.B. v. L.W.,
 
 793 So.2d 656, 658 (¶ 7) (Miss.Ct.App.2001)).
 

 ¶ 11. As the chancellor correctly found, there has not been a custody determination either decided or approved by the court with regard to C.H. In line with our decision in
 
 Williams,
 
 de facto custody is not a dispositive factor as to whether the modification standard applies. Thus, the chancellor’s statement that he viewed this matter as a “straight custody case” was not an incorrect statement of law. Nevertheless, the matter was pleaded and tried as a case for custody modification, and the chancellor ultimately reached a final decision on that basis. Accordingly, we now move to determine whether the evidence supports the chancellor’s ruling.
 

 ¶ 12. In accord with
 
 Tucker,
 
 the governing case law has delineated a three-part test for custody-modification proceedings. The moving party must prove by a preponderance of the evidence that: (1) a material change in circumstances has occurred; (2) this change adversely affects the welfare of the child; and (3) a change of custody is in the best interest of the child.
 
 Mercier v. Mercier,
 
 11 So.3d 1283, 1286 (¶ 9) (Miss.Ct.App.2009). Chancellors are also instructed to take into consideration the totality of the circumstances in determining whether there has been a material change in circumstances.
 
 Mabus v. Mabus,
 
 847 So.2d 815, 818 (118) (Miss.2003). A custody modification is warranted in the event that the moving parent successfully demonstrates that an application of the
 
 Albright
 
 factors reveals a material change which adversely affects the child and that a change of custody is in the child’s best interest.
 
 Jones v. Jones,
 
 878 So.2d 1061, 1065 (¶ 11) (Miss.Ct.App.2004) (citing
 
 Sanford v. Arinder,
 
 800 So.2d 1267, 1272 (¶ 18) (Miss.Ct.App.2001)). “Above all, in modification cases, as in original awards of custody, we never depart
 
 from
 
 our polestar consideration: the best interest and welfare of the child.”
 
 Johnson v. Gray,
 
 859 So.2d 1006, 1013 (¶ 33) (Miss.2003) (citations and internal quotations omitted).
 

 ¶ 13. We find that the record adequately supports the chancellor’s evidentiary findings with regard to the negative-hygiene issues experienced by C.H., her academic struggles, and the incident that endangered C.H. brought about by Curry’s reckless decision to drive with impaired vision.
 

 ¶ 14. Evidence was presented that while in Curry’s care, C.H. has suffered from an episode of lice infestation, a urinary-tract infection, at least one yeast infection, allergies, a lack of bathing and toilet training, and a broken arm.
 

 ¶ 15. Yolonda testified that she discovered C.H.’s lice infestation during one of C.H.’s visits with McDaniel when she observed C.H. scratching her head. According to Yolonda, she successfully got rid of the lice with treatment. Curry testified that C.H. was afflicted with head lice from her kindergarten class when she and C.H. were living in Mississippi, and she claimed that she treated the lice infestation. Yo-londa testified that C.H. has had multiple yeast infections, one since moving to Tennessee, the rest occurring prior to the June 2007 visitation order. Yolonda said that she, herself, obtained the necessary medication to treat C.H.’s yeast infections. According to Curry, however, C.H. has had only one yeast infection, which was due to C.H. having to take antibiotics. As to C.H.’s urinary-tract infection, the record reveals that it occurred while C.H. was living in Tennessee. According to Yolon-da, Curry obtained the necessary medication to treat this condition and sent the
 
 *1231
 
 medication with C.H. during one of C.H.’s visits to Mississippi.
 

 ¶ 16. McDaniel and Yolonda each testified that C.H. suffers from allergies. According to McDaniel, C.H. is allergic to cigarette smoke. McDaniel testified that C.H. was always sick with a runny nose, and she smelled like smoke at the beginning of each of his visitations with C.H. He said that he had asked Curry to quit smoking around C.H. because it was making her sick. Curry testified that she did not know whether C.H. was allergic to cigarette smoke; she stated that she thought C.H. was allergic only to cats. Curry added, however, that she and her husband have both quit smoking.
 

 ¶ 17. According to Yolonda, C.H. has demonstrated an inability to bathe correctly on her own, and she has had to teach C.H. how to clean her body and wash her hair. Yolonda said that C.H., who was almost eight-years old at the time of her last visit with McDaniel, had to call out for her help after using the restroom because she did not know how to wipe herself. According to Curry, however, C.H. knows how to bathe herself, and she can do so unsupervised. Curry also testified that C.H. is toilet trained, and she has not had to assist C.H. with wiping herself since C.H. was in diapers.
 

 ¶ 18. As to C.H.’s broken arm, Curry testified that the injury occurred from a trampoline accident at their home in Tennessee. Although McDaniel attempted to question Curry as to whether this is how the injury actually occurred, he failed to provide sufficient countervailing evidence that might lead one to conclude otherwise. Much ado, however, was made at trial with regard to the circumstances following this injury. McDaniel claimed that Curry used the injury purposely to impede his summer visitation with C.H. He alleged that Curry would not allow C.H. to come to Mississippi because she had doctors appointments. McDaniel also had a problem with the fact that Curry’s husband had removed the cast instead of C.H.’s doctor. Curry, on the other hand, testified that she did not intend to interfere with McDaniel’s visitation with C.H., and she told the court that all McDaniel had to do was drive up to Tennessee and get C.H. Curry testified that her husband had removed the cast because C.H. had missed her appointment with the doctor to have it removed. Curry stated that she took C.H. to the doctor the following day, and C.H.’s arm checked out fine.
 

 ¶ 19. With regard to C.H.’s academic struggles, the record reveals that C.H. was held back in five-year-old kindergarten because her teacher felt that C.H. was not yet mature enough to advance forward. At the time of trial, C.H. was in the second semester of first grade. Curry testified that C.H. struggled during the first semester, but she was doing better in the second semester. Curry did not present the chancellor with any progress reports; however, she submitted into evidence merit certificates awarded to C.H. for her perfect attendance.
 

 ¶ 20. On the matter of child endangerment, the evidence showed that in December 2008, prior to the second hearing in February 2009, Curry and C.H. were involved in an automobile accident; the record does not disclose whether anyone was injured. Curry was driving at the time. According to the record, Curry suffers from a hereditary eye disease, known as Reginitis Pigmentosa. Curry, who was thirty-nine years old at the time of trial, said that she has had the disease since her late twenties. According to Curry, the disease has rendered her legally blind; thus, she is not licensed to drive. When asked why she was driving when the accident occurred, Curry said that her father,
 
 *1232
 
 who had been living with them in Tennessee, had recently passed away, and they were going to have his ashes spread. The chancellor queried Curry as to the severity of the disease. According to Curry, she is able to read with the aid of reading glasses. She told the chancellor that she was able to see him, although he was blurry. Curry indicated that the disease is degenerative, and she is under doctors’ care. She said that there has been little change in her vision over the last year. Curry testified that the disease does not interfere with her ability to care for C.H. She told the court that her husband, who works as a local truck driver, is there to assist with C.H.’s care. She admitted, however, that her husband’s job requires him to go out of town once a week. Curry said that she has a friend, who is a registered nurse, that lives ten to fifteen minutes away from their home and is willing to drive Curry and C.H. wherever they need to go when Curry’s husband is not home. Curry also said that she has a neighbor, whom Curry described as an elderly woman, that lives down the hill from their house who can also provide assistance if necessary.
 

 ¶ 21. We acknowledge Curry’s argument that all children get sick and experience accidents. We also acknowledge that the type of ailments experienced by C.H., some of which the record reveals occurred prior to her move to Tennessee, do not necessarily, in and of themselves, demonstrate neglect on the part of the custodial parent. And certainly, some children, at no fault of the parent(s), struggle academically. The chancellor acknowledged these realities as well. But, the chancellor found it significant in this particular case that C.H. has continued to demonstrate an inability to bathe and clean herself properly. Implicitly concluding Yolonda’s testimony to be more credible than Curry’s, the chancellor found it unacceptable that a girl C.H.’s age has shown an on-going lack of bathing skills and toilet-training. With regard to C.H.’s academic struggles, the chancellor acknowledged that C.H. has had perfect attendance while in the first grade. However, he found it problematic that Curry failed to provide the court with evidence as to C.H.’s current progress. The chancellor expressed that a child who fails five-year-old kindergarten, likely has a tough academic future ahead of her, and Curry provided the court no adequate explanation for C.H.’s academic struggles. Lastly, what clearly troubled the chancellor most in this matter was the driving incident in December 2008. The chancellor indicated that the decision by Curry, who is vision impaired, to place C.H. in such a situation demonstrated poor parenting skills and caused him concern about Curry’s ability to make good judgments.
 

 ¶ 22. The evidence presented sufficiently supports each of the aforementioned factual findings by the chancellor, and we find that the chancellor properly took into consideration the totality of the circumstances in this case.
 
 Mabus,
 
 847 So.2d at 818 (¶ 8). Based on our review of the record, we cannot say that the chancellor manifestly erred in concluding that a material change of circumstances had occurred which adversely affected the safety and welfare of C.H. Accordingly, these issues are without merit.
 

 III. The chancellor committed manifest error in considering testimony he. had previously held inadmissible.
 

 IV. The chancellor’s consideration of evidence pertaining to Curry’s disability was discriminatory and in violation of the spirit of federal law.
 

 ¶ 23. Curry argues issues three and four together as they deal with the
 
 *1233
 
 same information. Curry avers that the chancellor placed undue weight upon her physical disability. She contends that while the chancellor gave other reasons to deny her custody of C.H. in his
 
 Albright
 
 analysis, it is clear that the chancellor ultimately decided this case on the fact that she has serious vision problems and McDaniel does not. Curry believes this is demonstrated by the chancellor’s reference to testimony, which he had previously ruled inadmissable, concerning Curry allegedly driving an automobile and by the chancellor’s statement that Curry did so while in a “high emotional state” which “shows poor reason and poor parenting skills.” Curry argues that the chancellor manifestly erred by taking inadmissable evidence into consideration, and she maintains that the chancellor’s statement describing her state of mind is wholly unsupported by the record. Curry argues that one can conclude from the chancellor’s accusation that because she suffers a disability, she therefore has poor parenting skills. Curry submits that such a finding reflects negatively on the State of Mississippi, and she proposes that we take into consideration the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (the “ADA” or “Act”), which she points out was a sweeping mandate enacted by Congress to protect our most innocent citizens.
 

 ¶ 24. At the outset, we find no persuasive authority which supports the proposition that the ADA applies or was intended to apply to child-custody determinations.
 
 See, e.g., Arneson v. Arneson,
 
 670 N.W.2d 904, 911 (S.D.2003) (“[N]o authority supports the extension of the ADA into parental custody disputes. Most cases concerning the application of the ADA in court proceedings deal with reasonable courthouse accommodations.”) (citing
 
 Matthews v. Jefferson,
 
 29 F.Supp.2d 525 (W.D.Ark.1998)). Section 12132 of the ADA mandates that “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.” While a state courthouse has been considered a “public entity” for purposes of the ADA, a child-custody determination has been held not to constitute the type of “service, program, or activity” contemplated by the Act.
 
 Arneson,
 
 670 N.W.2d at 911 (citations omitted).
 

 ¶ 25. A parent’s physical or mental disability does not in itself determine the outcome of a child-custody dispute; rather, it is the best interest and the welfare of the child that controls the chancellor’s decision.
 
 [2]
 
 Based on longstanding fundamental principle, the child’s best interest is expected to weigh in the judicial minds of our chancellors “far heavier than [the best interest] of either parent.”
 
 Evans v. Evans,
 
 994 So.2d 765, 769 (¶ 13) (Miss.2008) (citations omitted);
 
 see also Earwood v. Cowart,
 
 232 Miss. 760, 765, 100 So.2d 601, 603 (1958) (“The guiding star in such cases is the best interest of the minor child”). The physical and mental health of the parents is one of the
 
 Albright
 
 factors our chancellors are instructed to take into consideration when determining whose custody would serve the child’s best interest.
 
 Albright,
 
 437 So.2d at 1005. This individual
 
 Albright
 
 factor ordinarily should carry no less or greater weight than the others.
 
 Id.
 
 However, each case is different, and
 
 Albright
 
 was not meant to supplant those principles found in equity with any type of rigid mathematical formula.
 
 Buchanan v. Buchanan,
 
 587 So.2d 892, 897 (Miss.1991). Ultimately, the chancel
 
 *1234
 
 lor has the discretion to weigh the evidence “the way he [or she] sees fit” in determining the child’s best interest.
 
 Johnson,
 
 859 So.2d at 1013-14.
 

 ¶ 26. According to the record, at the first hearing in September 2008, McDaniel called Curry as an adverse witness. Curry was asked whether she had a wreck while driving with her daughter in the car since June 2007. Curry replied that she had not, because she did not have a license to drive. Curry was then asked whether she had a wreck with her daughter in the car in the last two years; Curry’s attorney objected to the question on the basis that the question encompassed a period of time prior to June 2007, when the child-support and visitation order was entered. The chancellor sustained the objection, and he instructed Curry not to answer to anything that happened before June 2007. At the subsequent hearing in February 2009, Curry was again asked on cross-examination whether at any time since the June 2007 order, she had a wreck while driving with her daughter in the car. Curry admitted that she had, and she indicated the incident happened in December 2008.
 

 ¶27. Clearly, the chancellor was not referring to testimony which he had previously ruled inadmissable, as the following portion of the chancellor’s ruling discloses:
 

 I’m concerned about the mother’s inability to make good judgment. This business about driving this last Christmas[;] ... while a custody case involving this child is in progress, she takes it upon herself to put this little girl in a vehicle and transport her, when she can’t see appropriately and doesn’t have a valid driver’s license. Being in a high emotional state is not an excuse. In fact, that is even more reason not to subject a child to this type of activity. It shows poor reason and poor parenting skills.
 

 The chancellor’s comment about Curry’s state of mind apparently stems from the exchange between Curry and her attorney during redirect examination, when counsel asked Curry why she was driving. As previously mentioned, Curry said the incident happened a few days after her father had died. The record indicates that Curry was very close to her father.
 

 ¶ 28. We find no merit to Curry’s contention that the chancellor grounded his decision solely on the fact that she suffers a severe vision limitation and McDaniel does not. Evidence was presented that put at issue Curry’s decision-making ability with regard to her disability, which gave the chancellor cause for concern with regard to the welfare of C.H.
 

 ¶ 29. Based on the aforementioned reasons, we find no merit with either of these two assignments of error. •
 

 Y. The chancellor’s
 
 Albright
 
 analysis was fatally flawed.
 

 ¶ 30. In determining who, in the best interest of the child, should have custody, our chancellors are instructed to take the following factors into the consideration: (1) age, health, and sex of the child; (2) continuity of care; (3) who has the best parenting skills and who has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school, and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of the home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship.
 
 Albright,
 
 437 So.2d at 1005.
 

 
 *1235
 
 ¶ 31. The chancellor made detailed findings in this case with regard to the
 
 Albright
 
 factors. In summary, the chancellor found as follows:
 

 (1) Age, Health and Sex of the Child
 

 ¶ 32. Because C.H. was approximately eight years old at the time of trial, and not of tender years, her age favored neither McDaniel or Curry. The chancellor found that C.H.- suffers from allergies, and he found that McDaniel placed more attention on her allergies; thus, the health factor favored McDaniel. On the other hand, C.H. is female, which the chancellor found favored Curry. Ultimately, however, the chancellor concluded that this particular
 
 Albright
 
 factor weighed evenly for McDaniel and Curry.
 

 (2)Continuity of Care
 

 ¶ 33. The chancellor found that the evidence presented was insufficient for him to make an adequate determination as to whether this factor favored either Curry or McDaniel. The record supports the chancellor’s finding. Even though it was conceded that Curry has had de facto physical custody of C.H. most of her life, no evidence was presented beyond that fact.
 

 (3)Parenting Skills
 

 ¶ 34. The chancellor found that both parents have positives associated with their parenting skills, but both have exhibited some negatives as well. Both are currently married; but, prior thereto, both were living in a promiscuous relationship with someone of the opposite sex. Although there was no showing that C.H. was adversely influenced by such behavior, the chancellor found their conduct was inappropriate, nonetheless, and it reflected negatively on both of them.
 

 ¶ 35. The chancellor noted that C.H. has had issues with regard to her hygiene while in Curry’s care, and C.H. has demonstrated a poor academic performance while in Curry’s care. The chancellor reiterated his concern with the automobile accident that occurred in December 2008 involving both C.H. and Curry, which demonstrated poor judgment and poor parenting skills on Curry’s part.
 

 ¶ 36. With regard to McDaniel, the chancellor stated that he has not been the perfect parent either. The chancellor found the fact that McDaniel has failed to timely and properly pay child support constituted a significant factor. However, citing to
 
 Shelton v. Shelton,
 
 653 So.2d 283, 287 (Miss.1995), the chancellor held that this negative finding on the part of McDaniel did not outweigh the best interest of C.H.
 

 ¶ 37. On this
 
 Albright
 
 factor, the chancellor concluded that the parent exhibiting the best parenting skills slightly favored McDaniel.
 

 (4) Employment and Responsibilities of Employment
 

 ¶ 38. The chancellor did not address this particular
 
 Albright
 
 factor.
 

 (5)Physical and Mental Health and Age of the Parents
 

 ¶ 39. The chancellor found that age and mental health favored neither parent over the other. Physical health, however, favored McDaniel. The chancellor found that through no fault of her own, Curry suffers from a debilitating vision problem that, in all probability, is going to get worse over time.
 

 (6)Emotional Ties of Parent and Child
 

 ¶ 40. The chancellor found that both parents love C.H., and she loves them. This factor favored neither parent over the other.
 

 (7)Moral Fitness of the Parents
 

 ¶ 41. The chancellor found this factor even between the parents.
 

 
 *1236
 

 (8)Home, School, and Community Record of the Child
 

 ¶ 42. The chancellor found that the school and community record favored neither party. The home factor, however, favored McDaniel. The chancellor reasoned as follows:
 

 McDaniel has got a traditional family situation. He’s got a step-mother who is there for [C.H.] to care for her needs when he cannot. He has got a close system of relatives in the nearby vicinity, and he’s able to transport [C.H.] and do other things for her. [Curry] has the same traditional type family arrangement, but she is disadvantaged to the extent that she can’t drive. She can’t take [C.H.] places even in the event of an emergency, [and must] rely on acquaintances to come to the aid of [C.H.] in order to transport her or provide assistance.
 

 (9)Preference of the Child
 

 ¶43. This factor was inapplicable as C.H. was not of age to express a preference.
 

 (10)Stability of Home Environment and Employment of Each Parent
 

 ¶ 44. The chancellor found that the stability of the home environment favors neither parent over the other; both have remarried; and both are doing well. The chancellor found that the stability-of-employment factor favors McDaniel. Curry, unintentionally, is disadvantaged from an employment standpoint due to her vision problem. On the other hand, C.H. has a half-sister who is two years older than her that lives with Curry. C.H. also has a half-brother through Curry, who lives with his father in Mississippi. The chancellor noted that our supreme court does not favor splitting siblings, and this factor slightly favored Curry.
 

 ¶ 45. Ultimately, the chancellor concluded that the polestar consideration and the majority of the
 
 Albright
 
 factors applied to the evidence before him favored placing C.H. in the custody of McDaniel.
 

 ¶46. Although Curry maintains that the chancellor should have never reached an
 
 Albright
 
 analysis, she contends that the chancellor also failed to give due weight to a number of the
 
 Albright
 
 factors in deciding the best interest of C.H. However, we may not reverse the decision of the chancellor unless his decision is clearly erroneous.
 
 Roberson,
 
 814 So.2d at 184 (¶ 3). And we may not set aside findings of fact made by the chancellor when those findings are supported by substantial, credible evidence.
 
 Marascalco,
 
 445 So.2d at 1382. We find no clear error in the chancellor’s decision. The chancellor thoroughly considered the
 
 Albright
 
 factors in determining the best interest of C.H., applying the substantial and credible evidence presents ed before him. Therefore, this issue is without merit.
 

 ¶ 47. THE JUDGMENT OF THE RANKIN COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., IRVING, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. GRIFFIS, J., CONCURS IN RESULT ONLY.
 

 [1]
 

 . In deference to the minor child, this Court has substituted initials in place of the child's name.
 

 [2]
 

 . See, e.g.,
 
 Deborah H. Bell, Mississippi Family Law § 5.02[1] (1st ed.2005) (noting that courts in every state determine custody based on the child's best interest).