02-10-264-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND DISTRICT OF
 TEXAS
 FORT
 WORTH
  
 
 


 

NO. 02-10-00264-CV

 


 
 
 NORMA SANO
 
 
  
 
 
 APPELLANT
 
 


 

V.

 


 
 
 JIMMY J. GREENLEE
 
 
  
 
 
 APPELLEE
 
 


 

------------

 

FROM THE
322ND DISTRICT COURT OF TARRANT COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

I.  Introduction

          In two issues, Appellant Norma Sano appeals
the trial court’s designation of Appellee Jimmy J. Greenlee as joint managing
conservator with the exclusive right to establish their child’s primary
residence in its divorce decree.  We affirm.

II.  Factual and Procedural Background

          After three years of litigation, the trial
court granted the parties’ divorce, appointed Sano and Greenlee as joint
managing conservators of their five-year-old son Calvin,[2]
and awarded to Greenlee the exclusive right to determine Calvin’s primary
residence.  The trial court’s findings of fact and conclusions of law included
the following:

FINDINGS
OF FACT

 

1.       Jimmy J.
Greenlee and Norma Sano were common law married in April of 2003.

 

2.       There was
one child born of this marriage.  That child was [Calvin], a male, born on
October 23, 2004, in Tarrant County, Texas.

 

. .
. .

 

4.       The Court
finds that the mother, Norma Sano, is unemployed, and draws a social security
disability check.

 

5.       The Court
finds that the father is employed.

 

6.       The Court
finds that two social studies have been filed in this case.

 

7.       The Court
finds that the mother did not have a driver’s license at the time of trial.

 

. .
. . 

 

9.       The Court
finds that the mother has questionable functioning and reasoning abilities.

 

10.     The Court
finds that the parents should be named joint managing conservators . . . . 

 

11.     [Calvin’s]
needs are better met and that it is in the best interest of the child for the
father to be the Joint Managing Conservator with the exclusive right to
establish domicile within Tarrant and Contiguous counties.

 

12.     The Court
finds that the domicile of the child should be restricted to Tarrant County,
Texas and adjoining counties.

 

. .
. .

 

18.     The Court
finds that the parties’ families reside in El Paso, and that Norma Sano desires
to move to El Paso with the child.

 

. .
. .

 

CONCLUSIONS
OF LAW

 

. .
. .

 

5.       Based upon
the evidence, I conclude as a matter of law that Common Law Marriage of the
parties took place in April of 2003.

 

6.       Based upon
the evidence, I conclude as a matter of law that Jimmy J. Greenlee and Norma
Sano should be appointed Joint Managing Conservators, and that it is in the
best interest of the minor child that the father, Jimmy J. Greenlee, be
appointed Joint Managing Conservator of the child, [Calvin] with the exclusive
right to establish domicile.

 

7.       Based upon
the evidence, I conclude as a matter of law that the child’s residence should
be restricted to Tarrant County and adjoining counties and find that this is in
the best interest of the child.

 

. .
. .

 

9.       The Court
considered the following factors in making a determination of a just and right
[community property] division[[3]]:

          a.       Norma
Sano’s disability;

          b.       Norma
Sano’s inability to be gainfully employed;

c.       Norma
Sano’s duties as a homemaker during the entire duration of the relationship
between her and Jimmy Greenlee; and

d.       Norma
Sano’s disparity of earning power and means of support.

 

. .
. . 

 

11.     Based
upon the evidence, I conclude that Norma Sano should not pay any child support
at this time because she is unable to do so because of her disability.

          Because Sano complains of the legal and
factual sufficiency of the evidence to support the trial court’s decision to
award the right to establish Calvin’s primary residence to Greenlee and to
support Fact Finding #9, we will address the evidence related to these issues within
our analysis below.[4]

III.  Discussion

          In her first issue, Sano complains that the
trial court abused its discretion by designating Greenlee as Calvin’s joint
managing conservator with the right to establish Calvin’s primary residence
because the evidence was legally and factually insufficient to support this
decision.  In her second issue, Sano argues that the trial court deprived Sano
of a fair trial and violated her constitutional rights by considering Sano as
disabled or intellectually impaired when the evidence was legally and factually
insufficient to support this finding.

A.  Standard of Review

We review the trial court’s decisions on custody,
control, possession, and visitation matters for an abuse of discretion.  In
re M.M.M., 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.) (citing
Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982)).  To determine
whether a trial court abused its discretion, we must decide whether the trial
court acted without reference to any guiding rules or principles; in other
words, we must decide whether the act was arbitrary or unreasonable.  Low v.
Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire v. Cummings, 134 S.W.3d
835, 838–39 (Tex. 2004).  An appellate court cannot conclude that a trial court
abused its discretion merely because the appellate court would have ruled
differently in the same circumstances.  E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549, 558 (Tex. 1995); see also Low, 221 S.W.3d
at 620.  And an abuse of discretion does not occur when the trial court
bases its decisions on conflicting evidence and some evidence of substantive
and probative character supports its decision.  Unifund CCR Partners v.
Villa, 299 S.W.3d 92, 97 (Tex. 2009); Butnaru v. Ford Motor Co., 84
S.W.3d 198, 211 (Tex. 2002).

Findings of fact entered in a case tried to the court
have the same force and dignity as a jury=s
answers to jury questions.  Anderson v. City of Seven Points, 806 S.W.2d
791, 794 (Tex. 1991).  The trial court=s
findings of fact are reviewable for legal and factual sufficiency of the
evidence to support them by the same standards that are applied in reviewing
evidence supporting a jury=s answer.  Ortiz
v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881
S.W.2d 295, 297 (Tex. 1994).  However, in a review of a child custody ruling,
“legal and factual sufficiency are not independent grounds of error but are
relevant factors in deciding whether the trial court abused its discretion.”  M.M.M.,
307 S.W.3d at 849.  We consider whether (1) the trial court had sufficient
information upon which to exercise its discretion and (2) whether it erred in
its application of that discretion.  Id.  The first question is subject
to a traditional sufficiency review; we determine in the second question
whether, based on the elicited evidence, the trial court made a reasonable
decision.  Id.  A trial court is given wide latitude when determining
the best interest of the child and will only be reversed if it appears from the
record as a whole that the trial court abused its discretion.  Gillespie,
644 S.W.2d at 451.

B.  Evidence

          1.  Jimmy Greenlee’s Testimony

          At the time of trial in 2010, Greenlee was a
forty-two-year-old high school graduate who had worked for AT&T for ten
years.  Prior to working for AT&T, he spent around nine years in the United
States Navy.  Greenlee testified that Sano was disabled when he met her, that they
started living together in 1996, along with Sano’s then-ten-year-old daughter
from her prior marriage,[5]
and that they were not common law married until April 2003, based on filing
their 2004 income tax return jointly as married.  Greenlee said that 2004 was
the only time they had filed jointly as married because Sano wanted to retain
her Social Security Insurance (SSI) disability payments.[6] 
The parties lived together for seven years before Calvin was born.

          Greenlee testified that Calvin is delayed in
speech and development, and the trial court admitted into evidence Calvin’s
December 2007 speech therapy evaluation by a speech pathologist.  The
evaluation reflects that the speech pathologist diagnosed Calvin with profound
articulation disorder, severe-to-profound receptive and expressive language
disorder, and speech delay.  Greenlee stated that Calvin has been improving;
that he has been working with Calvin on his colors, shapes, numbers, and
letters at Calvin’s teacher’s request; and that Calvin needs interaction with
other children to help with his speech.  At the time of trial, Calvin attended
the Weldon Hafley Development Center, in the Eagle Mountain School District,
for four hours a day; Greenlee said that he would send Calvin to regular
kindergarten the following school year if that is what was recommended at the
end of the school year.

During Greenlee’s testimony, the trial court admitted
the following into evidence:

·       
An April 6, 2007 letter from the Social Security Administration (SSA)
to Sano, stating that effective February 2004, she was no longer eligible to
receive SSI benefits.

 

·       
A 2009 favorable ruling from the SSA to reinstate Sano’s SSI benefits
and the March 17, 2009 decision by the administrative law judge (ALJ),
including the ALJ’s findings of fact and conclusions of law.

 

·       
A photograph of Calvin’s room at Greenlee’s house, and a
photograph of Calvin’s dog at Greenlee’s house.

 

·       
Greenlee’s certificates of completion for two parenting courses.

 

          Greenlee stated that he wanted Calvin’s
domicile to remain in Tarrant County, where he lives, and that he wants to get Calvin
involved in Cub Scouts and sports.  Greenlee has a house and a car; he stated
that Sano does not drive.  He requested that Sano be given extended visitation
like Greenlee had had during the pendency of the divorce and said that he made
this request in Calvin’s best interest.

2.  Norma Sano’s Testimony

          At the time of the trial, Sano was Calvin’s
primary caregiver.  Sano stated that she had been receiving SSI disability
payments since 1988 and stated that her disabilities include a Torkildsen shunt
in her head and epileptic seizures controlled through medication.  In 1988, she
was in a coma for seven months, and calcification build-up during the prolonged
coma led to a loss of range of motion in her right elbow.  Sano said that her
last seizure was in 2006 but then said that it had just been a strong dizzy
spell and that she could not recall the last time she had had a seizure.  She
had a seizure in 2004 while she was under observation at the hospital, prior to
giving birth to Calvin.  Sano did not finish high school, and she testified
that she had never been employed while she and Greenlee were together.

Sano admitted that the ALJ had made a finding that she
had borderline intellectual functioning.[7]
 She also admitted telling the SSA that she was unable to sit, stand, or walk
for long periods of time due to pain, headaches, weakness, and side effects
from her medication—which included fatigue and sleepiness—and that she also
suffered from depression and chronic right elbow pain.  Sano stated that she
could take care of Calvin because she was on medication.  With regard to Sano’s
disabilities, the following dialogue occurred between Sano and her attorney
during Sano’s testimony:

Q.  One real quick
concerning your disability status.  You have been—it has been determined by the
government that you are not capable of maintaining full-time employment,
correct?

 

A.  Yes.

 

Q.  It has not been
established by the government that you’re not capable of taking care of your
son, correct?

 

A.  Yes.

 

Q.  You touched on
it a little earlier that at work, if you get tired, you just can’t expect a
boss to let you go sit down and find a quiet place to sit down, correct?

 

A.  Yes.

 

Q.  But while you’re
taking care of your son, if you get tired or you need to sit down, nobody is
there to boss you around to say you can’t do that, correct?

 

A.  Yes.

 

Q.  Is that what you’re
saying?

 

A.  Yes.

 

Q.  Is that what you
want the Court to understand?

 

A.  Yes.

 

Sano noted that the issue of her child-raising ability
was not discussed with the SSA in determining her eligibility for disability
benefits.  The SSA had Sano undergo a psychological evaluation, and she
admitted that she had discussed a cognitive adjustment disorder with the
psychologist.

          With regard to Calvin’s speech and
development delays, Sano testified that her son is fine and just “a little bit
behind” in his speech, but she admitted that Calvin did not finish
potty-training until age four.  Sano said that she wanted Calvin to be around
other children but that it was just her and Greenlee living in the area.

Sano testified that she does not like to drive but
that she knows how to drive.  In response to Greenlee’s attorney’s question,
“You don’t have a driver’s license?”  Sano replied, “No, I don’t like to
drive.”  Sano said that she could take Calvin places by calling friends who are
willing to drive her.

          Sano testified that she would like to move
with Calvin to El Paso to be closer to both parties’ relatives.  Specifically,
the following dialogue occurred between Sano and her attorney during Sano’s
testimony:

Q.  Listen to my
question.  Why do you want the restriction from Tarrant County taken off so
that you can move?

 

A.  To El Paso.

 

Q.  You want to move
to El Paso?

 

A.  Yes . . . 
Because both families for [Calvin] are over there, both grandmas.

 

Sano clarified that she meant that Greenlee’s mother and
Sano’s mother were both in El Paso.  Sano stated that if the geographic
restriction were removed, she would be willing to pay for one plane ticket a
month so that Calvin could visit his father, and she proposed that Greenlee pay
for any additional plane tickets per month.

          At the close of Sano’s testimony during
Greenlee’s case-in-chief, the trial court asked her some questions, including
whether she was on Medicaid and whether she went to Mental Health Mental
Retardation (MHMR), whether her daughter also had developmental problems, and
what kind of extracurricular or organized activities Calvin was involved in
that would allow him to interact with other children.  Sano said that she was
on Medicaid, said “yes” to MHMR, and said that her daughter did not have
developmental problems and made As and Bs in high school.  Sano stated that Calvin
played “a lot in the house,” that he did not have any friends, and that she did
not yet have him in any group activities, although she was thinking of putting him
in extra time at the YMCA.  Finally, the trial court asked her about driving:

THE COURT:  Well,
let me go into this.  You say you don’t care to drive, right?  You don’t like
to drive?

 

[SANO]:  No, I don’t
like to drive.

 

THE COURT:  But you
could drive?

 

[SANO]:  Yes.

 

THE COURT:  You
could have a driver’s license right now, right?

 

[SANO]:  Yes.

 

THE COURT:  I don’t
care to cook, but there are some things that I think for the betterment of
other members of the family you have to do regardless.  Do you consider driving
a necessity in today’s world?

 

[SANO]:  Well, it’s
because I --

 

THE COURT:  No.  You
don’t consider it a necessity?

 

[SANO]:  No.

 

Sano complained during Greenlee’s case-in-chief and in
her own case that Greenlee did not take Calvin to the doctor or dentist when
she asked him to, that he did not keep her adequately informed about Calvin’s
health when Calvin stayed with him, and that Calvin was always sick when Greenlee
returned him to her.  Specifically, Greenlee dropped Calvin off wearing a cast after
Calvin broke a bone at McDonald’s instead of notifying her when it happened;
Sano’s brother took Calvin to the doctor when Calvin had pneumonia; Greenlee
did not tell her when Calvin had asthma but instead just returned the child on
a Monday morning with his medication; and almost once a month, Greenlee would return
Calvin home sick and then she would have to take him to the doctor.  Sano said
that she does not contact Greenlee when she takes Calvin to the doctor because
Greenlee does not call her when he takes Calvin to the doctor and because
Greenlee already knows that the child is sick when he drops Calvin off.  Sano
also complained that Calvin had to go to school tired when Greenlee would return
Calvin to her at 6:30 a.m. so that Greenlee could get to work at 7 a.m.

3.  Additional Testimony 

After Sano finished her case-in-chief, the trial court
asked Greenlee why he failed to notify Sano about Calvin’s broken bone when he
was at the hospital getting it fixed.  Greenlee stated that the accident
happened on a Sunday, and he brought Calvin to Sano in a temporary cast.  Sano
told him that he would have to take Calvin to the follow-up appointment—when
the fracture was discovered and permanent cast put on—“since he got hurt during
your time.”  The trial court then asked Sano additional questions, including
whether she took pain medication.  Sano said that she took Arthiotec once a day
for pain in her back caused by arthritis.

4.  Additional Evidence

          Petitioner’s Exhibit 15, the SSA’s decision
to reinstate Sano’s SSI benefits, which set out the ALJ’s findings and
conclusions, was admitted in evidence without objection.  The ALJ’s findings
included the following:

4.  The claimant has
the residual functional capacity to perform sedentary work . . . except that
she cannot sit, stand, or walk for long periods of time and is unable to work 8
hours a day, 40 hours a week, secondary to fatigue, pain, and weakness.

 

. . . .

 

The record reflects
that the claimant has been diagnosed with seizures controlled with medications,
shunt placement in brain to control pressure, loss of range of motion and
strength of right elbow, depressed mood and anxiety, back pain, and borderline
intellectual functioning.  To further develop the case the Administration sent
the claimant to Enrique Porras, M.D. on May 15, 2007 for internist consultative
examination.  The claimant presented with seizures, high blood pressure, and
arthritis.  The claimant report[ed] being involved in a motor vehicle accident
in 2004 which resulted in arthralgias affecting the right side and tailbone. 
X-rays indicated arthritis and evidence of trauma.  She is able to sit for no
more than one hour without pain from hip and tail bone. . . .  Dr. Porras
diagnosed the claimant with right elbow arthralgia due to degenerative joint
disease, coccygeal pain, seizure disorder, clinical depression decompensated,
arterial hypertension, hyperlipidemia, hypothyroidism, and chronic headaches.

 

The Administration
also sent the claimant to Randall Rattan, Ph.D. for a psychological
evaluation.  Based on his examination, Dr. Rat[t]an diagnosed the claimant with
cognitive disorder, NOS, adjustment disorder with mixed depressed mood and
anxiety, and borderline intellectual functioning. . . . 

 

The sealed record in this case contains a social study
report dated June 12, 2007, that is based on interviews with Sano, Greenlee,
and Calvin’s babysitter and home visits with each parent when Calvin was with
them, and a follow-up social study report covering interviews in September
2007.[8]
 The trial court took judicial notice that both reports were in its file, took
judicial notice of its file, and stated that it had already reviewed them; it
also took notice of Sano’s objections to the social studies in her
interrogatories and her request for production.  However, Sano’s
interrogatories and her request for production were not included in the record
on appeal, and she never secured a ruling on these objections.  Neither party
called the authors of the social study reports to testify, and many of the
statements in the social study reports were cumulative of the evidence adduced
at trial and set out above.

In the June 2007 report, the social worker found that Calvin
seemed bonded with both parents, reported that Sano said she was not allowed to
drive a car due to her seizures, and reported that Sano told her that Greenlee
would not agree to change his visits with Calvin when she had to go to El Paso,
so she went anyway.  In her report, the social worker stated that she tried to
explain to Sano that Sano “could not just do what she wanted” and stated that
Sano did not seem to understand that Greenlee was entitled to his time and that
it was improper for Sano to prevent him from having his access period just
because she needed or wanted to do something else.  Sano revealed to the social
worker that she had called in a report to Child Protective Services (CPS) alleging
neglectful supervision of Calvin by Greenlee, which CPS ruled out.  The social
worker concluded that Greenlee appeared to be the more stable of the two
parents and recommended that the parents have joint managing conservatorship
with Greenlee having primary custody with a geographical restriction to Tarrant
County and Sano having standard access.

In September 2007, another social worker reported that
during her home visits, Calvin appeared more verbal, compliant, and calm with
Greenlee than with Sano.  She noted that Calvin was in Greenlee’s primary care
and that Calvin appeared to be doing very well there.  In both reports, the social
workers observed that Sano appeared to have concerns about normal childhood
injuries that did not warrant seeking medical attention.

C.  Analysis

In her first issue, Sano complains that the evidence
is legally and factually insufficient to support the trial court’s decision to
designate Greenlee as the joint managing conservator with the right to
establish Calvin’s primary residence, arguing that the trial court improperly
focused on her lack of a driver’s license and drew inferences from her epilepsy
and that the trial court “arbitrarily concluded that Sano was a person with a
disability without proof that her impairment met the legal definition” under
the Americans with Disabilities Act (ADA).  In her second issue, Sano argues
that the trial court deprived her of a fair trial and violated her
constitutional due process rights by considering her as disabled or
intellectually impaired when the evidence is legally and factually insufficient
to support that finding.  She claims that “[b]randing Sano as physically
disabled and mentally diminished without affording her the opportunity to rebut
such inferences amounts to an arbitrary and wrongful action by the court and a
denial of fairness, as well as running the risk of erroneously depriving a
parent of a protected right.”

When determining issues of conservatorship,
possession, and access to a child, the best interest of the child shall always
be the primary consideration of the court.  Tex. Fam. Code Ann. § 153.002 (West
2008); In re C.A.P., Jr., 233 S.W.3d 896, 901 (Tex. App.—Fort Worth
2007, no pet.) (“Section 153.002 requires the court to always put the child’s
best interest first in matters of possession and access to the child.”).  If it
is in the best interests of the child, the court may appoint both parents as
joint managing conservators, but it must designate to one of them the exclusive
right to determine the child’s primary residence, with or without geographical
restrictions.  Tex. Fam. Code Ann. § 153.134(a), (b)(1) (West 2008).  In
determining which conservator will have the exclusive right to establish
primary residence under section 153.134(b), the trial court is vested with
broad discretion.  In re K.L.W., 301 S.W.3d 423, 428 (Tex. App.—Dallas
2009, no pet.).  The trial court is in a better position than a reviewing court
to determine what will be in the child’s best interest because it observed the
parties and witnesses and their demeanors and had the opportunity to assess
each parent’s claims.  Rubinett v. Rubinett, No. 02-08-00021-CV, 2009 WL
1372936, at *2 (Tex. App.—Fort Worth May 14, 2009, pet. denied) (mem. op.).

We conclude that the trial court had sufficient
evidence upon which to exercise its discretion in determining which parent should
receive the exclusive right to determine Calvin’s primary residence.  Each
parent testified at the trial, and although Sano complains that the trial court
improperly focused on her lack of driver’s license, her epilepsy, and “what the
trial court inferred to be an intellectual failing,” there was sufficient
additional evidence presented at trial and in the two social study reports for
the trial court to make its decision, including testimony and evidence
regarding each party’s parental abilities, their plans for the child, and the
child’s needs.  See Holley v. Adams, 544 S.W.2d 367,
371–72 (Tex. 1976) (setting out nonexclusive list of best interest factors); In
re J.A.R., No. 02-04-00123-CV, 2005 WL 2839107, at *8–9 (Tex. App.—Fort
Worth Oct. 27, 2005, no pet.) (mem. op.) (applying Holley factors in suit
to modify divorce decree to appoint mother as primary managing conservator).

Further, although Sano appears to argue that the trial
court had to find that her impairment met the legal definition of “disability”
under the ADA to consider it,[9]
nothing in the record would suggest that the ADA applies here.  See 42
U.S.C.A. § 12101(a)(1), (3)–(4) (West 2008) (acknowledging discrimination “in
such critical areas as employment, housing, public accommodations, education,
transportation, communication, recreation, institutionalization, health
services, voting, and access to public services” against persons with physical
or mental disabilities and implementing the ADA to provide such persons a means
of legal recourse to redress such discrimination).  But even assuming that the
trial court had to find that Sano met the legal definition of “disability”
under the ADA, it had sufficient evidence, based on Sano’s own testimony
recounted above, to do so.  See id. § 12102(1)(A), (2)(A) (West
2008) (defining “disability” as “a physical or mental impairment that
substantially limits one or more major life activities,” and defining “major
life activities” as including, but not being limited to, “caring for oneself, performing
manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,
bending, speaking, breathing, learning, reading, concentrating, thinking,
communicating, and working” (emphasis added)).  And while Sano argues that
a parent’s disability should not affect an award of custody, she supports this
argument with citations to cases from other jurisdictions that do not control,
apply, or favor her case on the facts here.[10] 
We cannot say, on the record presented here, that the trial court abused its
discretion by designating Greenlee as the joint managing conservator with the
right to establish the child’s primary residence, and we overrule this portion
of Sano’s first issue.

          And, although Sano argues in her second
issue and in part of her first issue that her due process rights were violated
by the trial court’s “[b]randing” her as physically disabled and mentally
diminished when it did not order assessments of her physical and mental
disabilities or expert testimony to determine the extent of any disability and
how it would affect her and the child, or afford her the opportunity to rebut
such inferences, nothing in the record shows that Sano ever raised this complaint
in the trial court.  Therefore, she has failed to preserve her due process
complaint for our review.  See Tex. R. App. P. 33.1; Dreyer v. Greene,
871 S.W.2d 697, 698 (Tex. 1993) (rejecting due process complaint when party
failed to raise it at trial).  We overrule Sano’s second issue.

Additionally, the record is clear that the trial court
did not “brand” Sano as physically disabled and mentally diminished; rather, in
Finding of Fact #9, it found that she had “questionable functioning and
reasoning abilities,” which it could have determined based on her admission
that the SSA had found that she had borderline intellectual functioning, as
well as based on her testimony and demeanor at the hearing, the social study
reports, and her conduct during the three years of divorce proceedings, and it
could have also considered her physical disabilities—which she admitted to at
the trial—with regard to her ability to care for Calvin.  See Tex. Fam.
Code Ann. § 153.134(a)(7) (stating that in determining whether to appoint
parents as joint managing conservators, the trial court may consider “any other
relevant factor”).  And Sano had the opportunity during her case-in-chief to
present witnesses or other evidence to rebut the SSA’s findings—which were
admitted in evidence without objection by Sano—and to demonstrate that her
physical and intellectual issues had no effect on her parental abilities.  We
overrule the remainder of Sano’s first issue.

IV.  Conclusion

          Having overruled both of Sano’s issues, we
affirm the trial court’s judgment.

 

 

                                                                             PER
CURIAM

 

PANEL:  MCCOY, MEIER, and GABRIEL, JJ.         

 

DELIVERED:  June 16, 2011









[1]See
Tex. R. App. P. 47.4.





[2]We
use an alias to protect the child’s identity.  See Tex. Fam. Code Ann. §
109.002(d) (West 2010).





[3]In
Finding of Fact #24, the trial court set out its community property division,
including an award of 25% of the community balance of Greenlee’s retirement
fund to Greenlee and 75% of it to Sano.





[4]Sano
does not appeal the portions of the judgment granting the divorce or dividing the
parties’ community property.





[5]During
trial, Sano described her daughter as a twenty-four-year-old high school
graduate who was married and in college.





[6]Similarly,
Sano testified that she had wanted to marry Greenlee but could not “because of
[her] SSI.”





[7]When
asked by Greenlee’s attorney about the borderline intellectual functioning,
Sano asked the trial court if she could respond to that, and the trial court
told her, “Your attorney will take care of that.”  Then Greenlee’s attorney
asked, “That’s what the Social Security Board found for you though, right?” and
Sano replied, “Yes.”





[8]A
social study is an “evaluative process through which information and
recommendations regarding . . . conservatorship of a child, or possession of or
access to a child may be made to a court, the parties, and the parties’
attorneys.”  Tex. Fam. Code Ann. § 107.0501(1) (West 2010).  Under section
107.054, the agency or person making the social study shall file with the court
a report containing findings and conclusions, and the report shall be made a
part of the record of the suit.  Id. § 107.054 (West 2010).





[9]The
trial court only mentions “disability” three times:  In Finding of Fact #4, the
trial court states that Sano “draws a social security disability check,” which
is supported by the record as set out above.  In Conclusion of Law #9(a), the
trial court states that it considered Sano’s disability as a factor in making a
determination of a just and right division of the parties’ community property. 
Sano does not appeal the portion of the judgment dividing the parties’
community property.  And in Conclusion of Law #11, the trial court found that
Sano should not pay any child support “because she is unable to do so because
of her disability,” and Sano does not appeal the portion of the judgment
addressing child support.





[10]Sano
cites In re Marriage of Stopher, in which the appellate court upheld a
grant of permanent custody to the child’s developmentally disabled mother, but
the record in that case reflected that the mother, whose IQ was 67, had
substantial support in caring for the child and handled some situations better
than the child’s father.  767 N.E.2d 925, 926–33 (Ill. App. Ct. 2002).  Sano
also cites Lieurance-Ross v. Ross, but Ross involved a specific
Idaho statute requiring the court to make specific findings concerning a
parent’s disability and what effect, if any, the disability had on the child’s
best interest in any case where the court finds a parent’s disability to be
relevant to a child custody award.  129 P.3d 1285, 1290 (Idaho Ct. App. 2006). 
Texas has no such statutory requirement.  And Sano cites Curry v. McDaniel,
but in Curry, the court stated, “At the outset, we find no persuasive
authority which supports the proposition that the ADA applies or was intended
to apply to child-custody determinations,” before noting that the physical
and mental health of the parents is one of the factors that courts are to
consider when determining whose custody would serve the child’s best interest. 
37 So. 3d 1225, 1233 (Miss. Ct. App. 2010) (emphasis added).