990 So.2d 774 (2008)
Amy Nicole WILLIAMS, Appellant,
v.
Marcus Shane STOCKSTILL, Appellee.
No. 2007-CA-00599-COA.
Court of Appeals of Mississippi.
May 20, 2008.
Rehearing Denied September 23, 2008.
*775 William E. Andrews, III, Candance L. Rickman, attorneys for appellant.
Richard C. Fitzpatrick, Poplarville, attorney for appellee.
EN BANC.
LEE, P.J., for the Court.

FACTS AND PROCEDURAL HISTORY
¶ 1. Amy Nicole Williams (Amy) gave birth to Madison Jean Williams on July 3, 2003. Marcus Shane Stockstill (Shane), married to Tonya Stockstill, recognized Madison as his daughter. On May 16, 2005, Shane petitioned the Chancery Court of Pearl River County to establish paternity, to amend Madison's birth certificate to reflect her last name as Stockstill, to establish a visitation schedule, and to set child support for him to pay. Amy filed no responsive pleading to the original petition. After holding a conference on the matter, the chancellor ordered that Shane and Amy have joint legal custody of Madison with Amy having paramount physical custody. A visitation schedule was arranged for Shane. The chancellor also ordered that Madison's birth records be changed to reflect Shane as the father and to change Madison's surname to Stockstill. Shane was ordered to pay child support and provide medical insurance for Madison. The parties and their extended families were ordered to attend counseling with Dr. John Pat Galloway at Shane's expense.
¶ 2. Subsequent to the above order, and upon permission by the chancellor, Shane filed a supplemental and amended petition seeking primary physical custody of Madison with appropriate provisions regarding a visitation schedule for Amy and Amy's payment of child support. Dr. Galloway filed several written reports with the chancery court documenting his findings based on counseling sessions with the family. Based on Dr. Galloway's recommendation, the chancellor referred the parties to Dr. Joseph Tramontana, a clinical psychologist, for further evaluations. Once the court received the evaluations and recommendations of Dr. Tramontana, a full evidentiary hearing was held. The court entered an opinion finding that it was in the best interest of the child to grant joint legal custody to Shane and Amy with primary physical custody vested in Shane.
¶ 3. Amy now appeals, arguing that the chancellor should have applied the material change in circumstances test rather than an analysis under the Albright factors. Amy contends that at the time of trial, de facto custody had been vested in her for three years. In the alternative, Amy argues that the decision of the chancellor was manifestly wrong based on the best interest of the child.
¶ 4. Finding no error, we affirm.

*776 STANDARD OF REVIEW
¶ 5. This Court will not disturb the findings of a chancellor unless we find an abuse of discretion, an erroneous application of law, or manifest error. Andrews v. Williams, 723 So.2d 1175, 1177(¶ 7) (Miss. Ct.App.1998). Thus, if we find substantial evidence in the record to support the chancellor's findings, we will not reverse. Wilbourne v. Wilbourne, 748 So.2d 184, 186(¶ 3) (Miss.Ct.App.1999).

DISCUSSION

I. DID THE CHANCELLOR APPLY THE CORRECT LAW IN DETERMINING CUSTODY?
¶ 6. Amy argues that the chancellor should have first determined whether there had been a material change in circumstances which adversely affected the child's best interest before reaching an Albright analysis. Amy asserts that Shane "waived his right to an Albright analysis because of his two year delay in bringing the custody proceeding." She argues that it was not until she was arrested that Shane decided to seek custody. At the time of the hearing, Amy was under house arrest for commercial burglary and drug charges. She argues that allowing fathers of children born to unwed parents an unlimited amount of time to seek custody creates an unfair advantage for fathers.
¶ 7. We find Amy's argument that the chancellor should have first determined if there was a material adverse change in circumstances to be without merit. The "material changes" standard used in modification proceedings is dependent on there being a prior determination of custody. Law v. Page, 618 So.2d 96, 101 (Miss.1993). Since no prior custody determination was made in this case, the proper standard of law to be applied is that found in divorce proceedings, which is the best interest of the minor child. Id.; Albright v. Albright, 437 So.2d 1003, 1004 (Miss.1983).
¶ 8. The dissents agree with Amy that since Shane did not seek custody of Madison for almost two years, Shane must now prove a material change in circumstances to modify custody. However, there is no law to support a different burden of proof for fathers of children born out of wedlock who delay in seeking custody. The law is that unless a prior custody determination has been made, custody is determined by the Albright factors. Law, 618 So.2d at 101; Romans v. Fulgham, 939 So.2d 849, 852(¶ 4) (Miss.Ct.App.2006); C.W.L. v. R.A., 919 So.2d 267, 271(¶ 10) (Miss.Ct.App.2005); S.B. v. L.W., 793 So.2d 656, 658(¶ 7) (Miss.Ct.App.2001).
¶ 9. Amy next argues that since Shane "shirked" his parenting duties for almost two years, the law should require him to prove by a preponderance of the evidence that he had acknowledged this child as his own for the first two years of her life and earned the right to be on equal footing with Amy regarding custody. This argument is also without merit. In Smith v. Watson, 425 So.2d 1030, 1033 (Miss.1983), the supreme court stated that in custody dealings involving a child born out of wedlock, when a father acknowledges the child as his own, the father is deemed on equal footing with the mother as to parental and custodial rights to that child.
¶ 10. We find that the chancellor applied the correct law as this was an initial custody determination rather than a custody modification. This issue is without merit.

II. DID THE CHANCELLOR PROPERLY APPLY THE ALBRIGHT FACTORS?
¶ 11. Amy argues, in the alternative, that if the chancellor used the proper standard in determining custody, the chancellor's *777 decision was manifestly wrong based on the best interest of the child.
¶ 12. It is well settled that in child custody cases, the polestar consideration is the best interest of the child. Albright, 437 So.2d at 1005. The factors used to determine what is in the "best interest" of a child with regard to custody are: (1) the age, health, and sex of the child; (2) determination of the parent who had the continuity of care prior to the separation; (3) which parent has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parents and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of the parent and child; (7) moral fitness of the parents; (8) the home, school, and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of the home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. Id.
¶ 13. The chancellor found the stability of the home environment and employment of the parents factor to weigh heavily in Shane's favor. Amy asserts that in analyzing this factor, the chancellor failed to acknowledge Shane's failures and shortcomings and placed unwarranted emphasis on the fact that he was married and more financially stable. Shane owned his own business and had a stable family life. Although both parents had made mistakes in the past, the chancellor found that Shane had made positive steps in improving his future while Amy's future remained uncertain because of her "erratic and criminal behavior." We find that the chancellor had substantial evidence to support a finding in favor of Shane on this factor.
¶ 14. Amy next argues that the chancellor erred in finding Shane to have stronger emotional ties to Madison. To support her argument, Amy points to the fact that she raised Madison, and Shane had to get comfortable with Madison before he even considered requesting custody. She asserts that although she had been sentenced on criminal charges to three years of house arrest and five years of probation, she was living with her parents where there was adequate room for her and her two daughters. Amy contends that she had held a job selling merchandise on Ebay, and her criminal charges had not affected her children. She argues that it is in Madison's best interest to remain in the home she had known since birth and continue to gradually build a relationship with Shane and his family. Amy also asserts that Madison had developed close emotional ties to Amy's five-year-old daughter from a previous relationship who lived with Amy. As for the emotional ties of the parent and child, the chancellor found that Madison had a strong attachment to each parent. The chancellor noted that Madison's strong attachment with Shane was particularly remarkable since she had spent substantially less time in his presence. We cannot find that the chancellor erred in weighing this factor in favor of Shane.
¶ 15. Finally, Amy argues that Shane should not have been awarded custody since his wife was resentful and vindictive because of his affair with Amy. The chancellor discussed this under the parenting skills and willingness to provide primary care factor. The chancellor stated that although upset over the affair, Shane's wife "supports his assertion of genuine and deep-seated desire" to have custody of Madison. Also, Shane's wife testified that she was willing and able to provide full-time care for Madison.
¶ 16. As to the moral fitness of the parents, Judge Griffis's dissent would find that, at best, neither parent should be *778 favored. The dissent focuses on Shane's moral past. Specifically, the dissent emphasizes Shane's affair with Amy while Shane was still married to his wife who was expecting twins. Our focus should not be on the past wrongdoing of the father but, rather, on what is in the best interest of the child in the present. In Riley v. Doerner, 677 So.2d 740, 744 (Miss.1996), the supreme court stated, "A child's resilience and ability to cope with difficult circumstances should not serve to shackle the child to an unhealthy home, especially when a healthier one beckons." We find the same logic to hold in this case. A child should not be shackled to the past when a better situation is available in the present.
¶ 17. At the time of trial, the chancellor found that Shane had made efforts to turn his life around, while Amy was under house arrest for possession of controlled substances and her future remained uncertain. We find that the chancellor was in the best position to make a determination as to the moral fitness of the parents. We agree that the chancellor had a difficult decision to make as both parents had moral issues, but the chancellor's findings were supported by the evidence and based on the present best interest of the child.
¶ 18. THE JUDGMENT OF THE PEARL RIVER COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
MYERS, P.J., IRVING, CHANDLER, ISHEE AND ROBERTS, JJ., CONCUR. KING, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CARLTON, J. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BARNES, J.
KING, C.J., dissenting.
¶ 19. Without discussion of the moral issues involved, I dissent as I would reverse the judgment of the chancellor and remand this case for the chancellor to treat this action as a request for a change in custody, as opposed to an initial custody request. While there was no custody decree entered by a court, the simple fact is that Amy was the person responsible for the care and support of Madison and in my opinion, the de facto custodian of Madison. To ignore this simple fact is contrary to reason and common sense.
¶ 20. The parties tried this case as a custody case rather than a case seeking a modification of custody. However, the best interest of the child should not be held hostage to the procedural shortcoming of the adults. In matters such as this, the court's primary consideration must always be the best interest of the child. Where a child has an established and longstanding custodial relationship, I think the court must consider and address the issue of de facto custody. Under such circumstances, if, and only if, the court finds that there was no de facto custodian should it proceed to dispose of the case as a simple custody case.
¶ 21. Accordingly, I dissent and would remand this case to the chancery court.
CARLTON, J., JOINS THIS OPINION.
GRIFFIS, J., dissenting.
¶ 22. With respect to the majority, I dissent on both issues presented. Indeed, I am of the opinion that, as to Issue I, the chancellor applied the incorrect legal standard, and as to Issue II, the chancellor's findings of the Albright factors were clearly erroneous and manifestly wrong.

I. Did the chancellor apply the correct law in determining custody?
*779 ¶ 23. The chancellor determined, and the majority agrees, that the appropriate legal standard was that of an initial custody determination and not that of a custody modification.
¶ 24. This Court considered the very same issue in Romans v. Fulgham, 939 So.2d 849 (Miss.Ct.App.2006). There, I was of the opinion that the chancellor, and this Court, failed to use the proper evidentiary standard in changing custody of a child born out of wedlock. Id. at 854-61 (¶¶ 21-57) (Griffis J., dissenting). Here again, a chancellor removes custody from the mother of a child born out of wedlock after considering only the Albright factors instead of first determining whether the absent father has met the higher evidentiary standard required for a modification of child custody.[1] I am of the opinion that the chancellor applied the wrong legal standard. The chancellor should have applied the heightened standard of a modification of child custody. Therefore, I am of the opinion that this Court should reverse and remand this issue to the chancellor.
¶ 25. Shane Stockstill married his wife, Tonya, in March 1999. Beginning in June 2002, during Tonya's pregnancy, Shane began and adulterous extra-marital affair with Amy Williams. In October 2002, Tonya gave birth to the couple's twins. Two months later, in December 2002, Tonya learned that Shane was committing adultery.
¶ 26. As a result of Shane's adulterous extra-marital affair, Amy became pregnant with Shane's child. Amy gave birth to Madison on July 3, 2003. Using Madison's birth date to back up to the point of conception, we may conclude that Amy and Shane were together in the act of a sexual encounter in October 2002. So at about the same time his wife was suffering the pain and agony of childbirth, Shane was finding comfort and pleasure with Amy.
¶ 27. In July 2003, Shane was absent when Madison was born. Shane was not with Amy. He did not go to the hospital to see his child. Shane provided Amy no comfort, encouragement, or reassurance during childbirth. Shane did not pay any of the expenses of Madison's birth; the State of Mississippi paid for the birth. Shane provided no financial support to Amy, prior to birth and very little after the birth. Shane changed no diapers, made no bottles, and provided no parental care whatsoever to Madison. Shane was not disturbed during the middle of the night by Madison's cry. Indeed, the first time Shane saw baby Madison was at a rest stop because Shane was scared that his wife, Tonya, might learn that he had met his daughter. Shane's first meeting with his child was arranged at Amy's suggestion, and Shane reluctantly met his own child.
¶ 28. Mississippi Code Annotated section 93-13-1 (Rev.2004) provides in part:

*780 The father and mother are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare and education, and the care and management of their estates. The father and mother shall have equal powers and rights, and neither parent has any right paramount to the right of the other concerning the custody of the minor or the control of the services or the earnings of such minor, or any other matter affecting the minor.
At Madison's birth, Shane failed to provide for the "care, nurture, [and] welfare" of Madison. Indeed, he was absent. Shane abandoned these rights due to his absence.
¶ 29. Indeed, the majority is correct that Mississippi law does not currently support my position. However, I am of the opinion that the law must protect the mother of a child born out of wedlock in these circumstances. At or about the time of Madison's birth, Shane knew or should have known that he was Madison's biological father. Morally and legally, Shane became responsible for Madison at that moment. Amy certainly was. A single mother without assistance from the father, Amy took Madison home. She cared for Madison beginning on July 3, 2003. She fed Madison, burped Madison, changed Madison's diapers, bathed Madison, and took care of every need Madison had beginning on July 3, 2003, and for three years thereafter, until the chancellor took custody away from her.
¶ 30. Shane brought this action in April 2005, only after he was aware that Amy had pleaded guilty to the crime of possession of a controlled substance, a serious criminal matter no doubt. I am not convinced whether Amy or Shane should have custody of Madison. However, I am concerned that the chancellor began his review of this matter with the incorrect evidentiary standard. After consideration of the modification standard, the chancellor may very well conclude that Shane has met the three-factor test necessary for a modification of child custody. The majority of this Court believes that since a chancellor has not previously considered the Albright factors, then the chancellor must consider only those factors. I disagree.
¶ 31. My legal argument on this issue was detailed in Romans, 939 So.2d at 854-61 (¶¶ 21-57) (Griffis J., dissenting). I will not restate the argument here. Suffice it to say that upon birth, actually earlier than the actual birth, Amy was the only parent that Madison had. As a result, there should be no need for a judicial determination of custody. Indeed, such custody determination was made when Shane ignored Madison's birth and failed to act as Madison's father beginning at her birth.
¶ 32. I would reverse and remand this case for the chancellor to treat this as a request for modification of custody. In a request for modification, "the chancellor's duty is to determine if there has been a material change in the circumstances since the award of initial custody which has adversely affected the child and which, in the best interest of the child, requires a change in custody." Sanford v. Arinder, 800 So.2d 1267, 1271(¶ 15) (Miss.Ct.App. 2001) (citations omitted). Accordingly, Shane, as the non-custodial parent, must satisfy the three-part test set forth in footnote number one.

II. Did the chancellor properly apply the Albright factors?
¶ 33. The majority is correct that the best interest of the child is the overriding issue for the chancellor to decide. Perhaps the chancellor's ultimate decision was correct. However, we must review the chancellor's application of the facts and interpretation of the Albright factors. My concern is that after I review the facts, I *781 am of the opinion that the chancellor's application of two of the factors was clearly erroneous and manifestly wrong. I would remand for the chancellor to consider the Albright factors correctly.
¶ 34. First, on the issue of "Moral fitness of the parents," the chancellor concluded:
Each parent has in the past demonstrated marks of deficiency to some extent in the moral area, but such is undoubtedly much more pronounced in the case of Amy. The evidence at best indicates positive movement in the area so far as Shane is graded, but the same cannot be said of Amy.
Considering Shane's actions that begat this controversy, both literally and figuratively, I am of the opinion that the chancellor's opinion here is clearly erroneous and manifestly wrong.
¶ 35. In Lawrence v. Lawrence, 956 So.2d 251, 260-61(¶ 34) (Miss.Ct.App.2006), this Court held:
Where both parties engage in extramarital affairs, neither should get the benefit of a finding of moral fitness. Fulk v. Fulk, 827 So.2d 736, 740(¶ 15) (Miss.Ct. App.2002). For example, in Fulk, we held that it was error to weigh a mother's affair with a woman more heavily than the father's instigation and involvement in the menage a trois relationship between the three. Id. Andy's affair with his pregnant secretary clearly is at the root of the disintegration and termination of this marriage. To give Andy credit in the custody determination because he kept his affair secret, hidden from his wife, does not entitle him to any favorable consideration under the moral fitness factor.
¶ 36. At best, the chancellor should have given neither Amy nor Shane the benefit of the moral fitness factor. The evidence is clear that neither of their lives have exhibited adequate moral fitness. Shane may be considered to have turned his life around. However, neither this Court nor the chancellor should forget that Shane's turn around and return to his wife, Tonya, was at the expense of Amy and Madison. Would Shane have received the same benefit in the custody proceeding with Tonya if he had chosen to forsake Tonya and her twins to turn around his life with Amy and Madison? Absolutely not!
¶ 37. The chancellor's determination must consider the best interest of Madison. Due to Shane's decisions, this poor child began life without the benefit of a father or a two-parent family. It was Shane's actions that caused this unfortunate beginning to her life. Shane had to decide which woman (and child or children) he owed his future to. With three children by two different women, Shane chose to go back to his wife. Now, after several years and to the misfortune of the "other" woman, Shane has custody of all three children.
¶ 38. When we examine the evidence in the record, there are two aspects of Amy's life that affect this analysis. First, she had a sexual relationship with a married man  Shane. Second, she pleaded guilty to the crime of possession of a controlled substance and was serving house arrest. Clearly, the chancellor considered the guilty plea as Amy's significant deficiency in the area of moral fitness.
¶ 39. Shane's moral deficiency did not deal with possession of a controlled substance. Shane's moral deficiency was sexual and his violation of his marital vows. Shane made the first immoral decision. He chose to have an adulterous extra-marital affair. Shane multiplied his moral indiscretion because his adultery occurred while his wife was expecting their children. After Tonya gave birth to his twins, with a *782 wife and now two children who needed his support, comfort, and care, Shane carried on his immoral ways by continuing the extra-marital affair with Amy, and he did so until December 2002, two months after his children were born.
¶ 40. Further compounding his moral deficiency, if we simply make a rough biological calculation that starts with Madison's birth date of July 3, 2003, Shane celebrated the birth of his twins by making a baby with a woman other than his wife. I am of the opinion that Shane's sexual sins in these circumstances do not support the chancellor's decision to hold him more morally fit than Amy.
¶ 41. The record does not include all of the details of Shane's extracurricular sexual activities. However, it is clear that in the years 2002 and 2003 he set his morals aside and caused the very situation that this Court must now sort out. Need we be reminded that had Shane retained his morals and kept his marital vows, then Amy and Shane would not be before the Court fighting for custody of Madison. I cannot accept the chancellor's determination that Shane is the more morally fit of these two individuals. Indeed, Amy has cast doubt on her moral fitness; but, I cannot agree that the chancellor correctly determined that Amy's moral deficiencies were "undoubtedly much more pronounced."
¶ 42. In Romans, 939 So.2d at 854(¶ 15), the chancellor weighted the moral fitness factor in favor of the father after noting that the mother "had given birth to three children out of wedlock, all with different fathers. The chancellor also noted testimony that Ryan had appeared to have learned from his past mistakes and had turned his life around significantly."
¶ 43. In In re M.D.B., 914 So.2d 316, 321(¶ 19) (Miss.Ct.App.2005), the chancellor considered the moral fitness factor to favor the mother because the father "admitted to acts of sexual involvement with other women during his relationship with" the mother.
¶ 44. Second, in my review of the chancellor's findings and the transcript of the hearing, I am of the opinion that Shane received favorable consideration in the determination of the Albright factors only because Amy had pleaded guilty to a criminal charge and was sentenced to house arrest. I am of the opinion that the chancellor failed to give Amy favorable consideration for her continuity of care through the date of the Court's opinion. The chancellor failed to consider the animosity that Tonya experienced because of Shane's affair. Now, she is being asked to raise her husband's child that was conceived with another woman. The chancellor failed to consider Tonya's violent temper or the disturbances that she had at the doctor's offices over the payment of Madison's medical expenses. When asked about her relationship with Amy, Tonya testified, "[w]e don't have a relationship. We don't get along very well."
¶ 45. Shane testified that there was a considerable adjustment that Shane and Tonya had to overcome from the conflict that this situation, Shane fathering a child with Amy, had created. They had to overcome very strong feelings about how wrong this adulterous extra-marital relationship was. Shane described his relationship with Tonya, after she learned of his relationship with Amy, as "chaos ... There was [sic] a lot of issues and problems." The record reveals that they still go to counseling over this issue. In fact, Shane testified that Tonya gave him a black eye and keyed his truck.
¶ 46. Finally, in Albright v. Albright, 437 So.2d 1003 (Miss.1983), the question actually presented was "whether the `tender age rule' in custody awards is violative *783 of the father's right to equal protection of the law under Fourteenth Amendment to the United States Constitution." Albright, 437 So.2d at 1004. The court held that the "tender years doctrine" has been weakened but not abandoned. Id. at 1005. Here, Amy received no benefit of that weakened doctrine. In Mosley v. Mosley, 784 So.2d 901, 906(¶ 17) (Miss.2001), the court recognized that a child the age of five was considered "a child of `tender years,'" and the chancellor properly considered this as a factor in favor of the mother. Here, Amy should have received some favorable consideration of the tender years doctrine.
¶ 47. In conclusion, I am concerned with this Court's interpretation of the appropriate legal standard that must be followed when considering the custody of children born out of wedlock. The law imposes a duty on the father, which begins at the child's birth. It is incumbent upon the father of a child born out of wedlock to seek custody at the time of the child's birth, or within a reasonable time thereafter, to avail himself of the benefit of an initial determination of custody through the chancellor's application of the Albright factors. I believe it is an injustice that the law would allow Shane to wait almost two years, while Amy fulfilled the duties as Madison's custodial parent, before seeking the initial determination of custody under Albright. I am of the opinion that the chancellor was required to consider Shane's petition for custody under the modification of custody standard instead of the initial determination of custody standard.
¶ 48. I would reverse and remand this case for the chancellor to consider this matter as a request for modification of child custody. Thereafter, if the chancellor determines that there has been a material change in the circumstances since the award of initial custody which has adversely affected the child and which, in the best interest of the child, requires a change in custody, the chancellor may consider the Albright factors.
¶ 49. For these reasons, I respectfully dissent.
BARNES, J., JOINS THIS OPINION.
NOTES
[1] In Mabus v. Mabus, 847 So.2d 815, 818(¶ 8) (Miss.2003), the Mississippi Supreme Court held:

In a case disputing child custody, the chancellor's findings will not be reversed unless manifestly wrong, clearly erroneous, or the proper legal standard was not applied. Hensarling v. Hensarling, 824 So.2d 583, 587 (Miss.2002). See also Wright v. Stanley, 700 So.2d 274, 280 (Miss.1997); Williams v. Williams, 656 So.2d 325, 330 (Miss. 1995). The burden of proof is on the movant to show by a preponderance of the evidence that a material change in circumstances has occurred in the custodial home. Riley v. Doerner, 677 So.2d 740, 743 (Miss. 1996).
In the ordinary modification proceeding, the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody. Bubac v. Boston, 600 So.2d 951, 955 (Miss. 1992).