MYERS, P.J.,
for the Court:
¶ 1. Heather and Alex Brumfield were married in July 1998, and they separated in March 2007. The Walthall County Chancery Court granted an irreconcilable differences divorce on May 16, 2008. Heather appeals the chancellor’s award of physical custody of the couple’s four children to Alex, with both parents to share legal custody.
FACTS
¶ 2. Alex and Heather have four children — three daughters and one son. The oldest, Debra Alexis (“Lexi”) was born about six months prior to the marriage. The youngest, Hali, was born on October 20, 2002. It was noted that the children were generally healthy and doing well in school. At the time of the divorce trial in late 2007 and early 2008, Alex was thirty years of age, and Heather was twenty-nine.
*141 ¶ 3. Throughout the marriage, Alex worked full time. He had a two-year degree in diesel mechanics, and since 2001 Alex worked as a bus mechanic for the South Pike School District in McComb, Mississippi. In addition to his regular employment, during the marriage Alex also completed the construction of the marital home,[1] worked a small farm, rebuilt farm equipment, and engaged in other productive activities. Heather went to school, worked various jobs, and was indisputably the children’s primary caregiver early in the marriage. Despite her work and familial obligations, Heather maintained a high grade-point average in school. She graduated in 2004 from William Carey University with a degree in elementary education. Heather then taught special education at Tylertown Elementary before transferring to Salem Elementary, where her children were enrolled, in 2006.
¶ 4. It is unclear what immediately caused the final separation, but Heather left the marital home for good in March 2007. From the testimony at trial, it appears that the couple had frequently engaged in loud, angry arguments. During one such argument in September 2005, Alex pinned Heather against a wall, threw her to the ground, and hit her twice with a belt, resulting in his prosecution for simple assault.[2] Shortly after that incident, Heather filed for divorce, but the parties apparently reconciled, and the divorce was not pursued. After the final separation in March 2007, Heather moved into a house owned by her grandmother. A temporary order provided for joint custody of the children, with Heather having physical custody most of the time. Alex was ordered to pay $400 per month in temporary child support.
¶ 5. Heather filed an amended complaint for divorce on May 9, 2007, alleging grounds of habitual cruel and inhuman treatment and habitual drunkenness. Alex counterclaimed for divorce, alleging adultery. In the alternative, both parties also sought an irreconcilable differences divorce, to which they ultimately agreed. Alex and Heather submitted the issues of property division and child custody to the chancellor.
¶ 6. The divorce trial could not be completed on the first day, so it was spread over two days. The first was on November 1, 2007, the second on February 28, 2008, and the final judgment of divorce was entered on May 16, 2008. The chancellor awarded custody of the children to Alex and ordered Heather to pay child support.
¶ 7. After Heather appealed on the custody issue, this Court remanded the case to the chancellor for more detailed findings of fact on the Albright factors. See Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). On our own motion, we also asked the chancellor to determine whether the statutory presumption against granting custody to a parent with a “history of family violence” should have been enforced *142 against Alex. See Miss.Code Ann. § 93-5-24(9)(a)(i) (Rev.2004). The parties were instructed to offer additional briefing to address the chancellor’s supplemental findings.
¶ 8. On remand, the chancellor expanded on her original findings, specifically addressing each of the Albright factors. She reaffirmed her prior conclusion that it was in the children’s best interest to be placed in Alex’s custody. The chancellor also expressly found that the violent incident was isolated and that Alex did not have a history of perpetuating family violence, as defined by the statute. She found no presumption against granting Alex custody of the children. If this presumption had existed, the chancellor found it had been rebutted. Heather contends that the chancellor erred in applying the Albright factors and in not enforcing the statutory presumption.
STANDARD OF REVIEW
¶ 9. “A chancellor’s findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.” Sanderson v. Sanderson, 824 So.2d 623, 625-26 (¶ 8) (Miss.2002) (citations omitted). Furthermore, we “will affirm the [child-custody] decree if the record shows any ground upon which the decision may be justified.... We will not arbitrarily substitute our judgment for that of the chancellor who is in the best position to evaluate all factors relating to the best interest! ] of the child.” Mosley v. Mosley, 784 So.2d 901, 905-06 (¶ 15) (Miss.2001) (quoting Yates v. Yates, 284 So.2d 46, 47 (Miss.1973)).
DISCUSSION
1. Statutory Presumption
¶ 10. In her findings of fact on remand, the chancellor found that Alex did not have a history of perpetuating family violence, as defined by the statute. Heather argues that this finding was erroneous.
¶ 11. Mississippi Code Annotated section 93 — 5—24(9)(a)(i) (Rev.2004) states in pertinent part that:
In every proceeding where the custody of a child is in dispute, there shall be a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence.
The statute defines a history of perpetuating family violence as either a pattern of family violence against a member of the household or a single incident of family violence that results in serious bodily injury. Id.
¶ 12. Heather testified that the incident occurred on September 9, 2005. The Brumfields had been without electricity since Hurricane Katrina struck two weeks before. Heather took the children out and bought makeup for Alii, who had recently turned five years old, as a birthday present. Later that day, Alex threw the makeup away after he found it on the floor. Heather took it out of the garbage and gave it back to the children. The two began arguing and gave the children contradictory instructions. Alex ordered the children to throw the makeup away, while Heather told them to keep it. Alex retrieved a belt and threatened to discipline the children with it, but they did not obey him because, according to Heather’s testimony, she was the one who usually spanked the children. Alex then grabbed *143 Heather, dragged her outside, threw her to the ground, and hit her twice with the belt.
¶ 13. The chancellor found Heather’s description of the September 2005 incident to be credible, but she concluded that it was an isolated incident insufficient to trigger the presumption. The chancellor noted that there was no testimony that Alex had hit Heather on any other occasion and that there was no suggestion that he had ever abused the children. We agree that the record establishes only a single incident of domestic violence.
¶ 14. The dissent suggests that a pattern of family violence could be found based on a document found in the record as an exhibit, a “sentencing order” from the Walthall County Justice Court. It indicates that after the separation, misdemeanor charges of “stalking” and “telephone harassment” had been brought against Alex (presumably by Heather, but the document itself does not say). Although styled a sentencing order, the document actually states that the charges were remanded to the file, with “recommendations” regarding child custody transfers and telephone contact.
¶ 15. A photocopy of the sentencing order is found in the record as an exhibit, but it does not appear to have been entered into evidence at trial, and there was no testimony authenticating it or otherwise establishing a foundation for its admission into evidence. Heather never mentioned bringing these charges against Alex in her testimony at trial. In fact, despite offering the sentencing order as an exhibit, Heather never mentioned the charges in her arguments before the chancery court or in her briefs before this Court. At trial, Heather did testify that, after the separation, someone had beaten on her door and shined a flashlight into the windows of her home on “several occasions,” but she admitted that she “wasn’t sure” it had been Alex, apparently conceding that she had no evidence he was responsible. The sentencing order — assuming it had been entered into evidence — and this testimony do not establish a second incident of domestic violence.
¶ 16. According to the statute, a single incident of domestic violence does not establish a history of family violence unless it results in “serious bodily injury.” Id. The only physical injuries Heather described as resulting from the incident were relatively minor — scratches to her face — and she was uncertain exactly how they had occurred.
¶ 17. The chancellor’s findings with regard to the statutory presumption must stand unless she “was manifestly wrong, clearly erroneous, or applied an improper legal standard.” J.P. v. S.V.B., 987 So.2d 975, 980 (¶ 12) (Miss.2008.) We can find no abuse of discretion in the chancellor’s finding that the single incident did not result in “serious bodily injury,” as required by the statute to support a finding of a history of family violence. Likewise, we cannot say that the chancellor abused her discretion in finding no “history of family violence” as defined by the statute and, consequently, no statutory presumption against awarding custody to Alex. Instead, we think the chancellor properly considered this incident in her Albright analysis, which we shall discuss below.
2. Albright Factors
¶ 18. The best interest of the child is the polestar consideration in deciding which parent should receive primary custody. Albright, 437 So.2d at 1005. Chancellors must consider the following factors to determine where the children’s best interest lies: (1) age, health, and sex of the children; (2) which parent had continuity of care; (3) which parent has better parenting skills and the willingness and capac *144 ity to provide primary child care; (4) the employment responsibilities of the parents; (5) the physical and mental health and age of the parents; (6) the moral fitness of the parents; (7) the emotional ties of the parents and children; (8) the home, school, and community records of the children; (9) the preference of a child at the age sufficient to express a prefei’ence by law; (10) the stability of the home environment and employment of each parent; and (11) the other relevant factors in the parent-child relationship. Id. On remand, the chancellor made detailed findings of fact on each factor. She concluded that all of the named Albright factors either favored Alex or did not favor either parent. The chancellor weighed this against the domestic violence incident, which she considered in the “other factors,” and concluded that it was in the children’s best interest to be placed in Alex’s custody.

A.Emotional Ties of Parents and Children; Children’s Preference

¶ 19. The chancellor found that the children had close emotional ties to both parents and that none of the children were old enough to state a preference. Heather does not challenge these findings on appeal,[3] and we find them supported by substantial evidence in the record.

B.Age, Health, and Sex of the Children

¶ 20. The chancellor found that this factor favored neither parent. On the final day of the trial, the four children ranged from five to ten years of age. They were described as intelligent and performing well in school. The children were generally healthy, although the youngest three had suffered from chronic ear infections. Alii, the second child, had a permanent tube placed into one of her ears that required continuing attention. It was generally acknowledged that both parents had been caring for Alii and that both were able to continue to do so.
¶ 21. Heather concedes that none of the children were of tender years. See generally Gilliland v. Gilliland, 969 So.2d 56, 66 (¶ 32) (Miss.Ct.App.2007) (“The tender years doctrine is a presumption that in all cases where any child is of such tender age as to require the mother’s care for [the child’s] physical welfare, [he or she] should be awarded to her custody, at least until [he or she] reaches that age and maturity where [the child] can be equally well cared for by other persons.”). Heather contends, however, that the chancellor should have found this factor favored her because three of the four children are girls.
¶ 22. In her opinion on remand, the chancellor considered and expressly rejected this argument. The chancellor acknowledged that there were three girls and one boy, but she found that the children should not be separated and that, on the whole, this factor did not favor either parent. Heather has not demonstrated that this was an abuse of discretion. We find the chancellor’s findings on this factor supported by substantial evidence.

C.Continuity of Care; Health and Age of the Parents; Parenting Skills and Willingness and Capacity to Provide Childcare; Home, School, and Community Records of the Children

¶ 28. The chancellor found that these factors favored Alex. Because each of these issues hinges on the chancellor’s *145 findings regarding Heather’s difficulties after her father’s death in 2005, we shall address them together.
¶ 24. At trial, the testimony was unanimous that Heather had been the children’s primary caretaker early in the marriage. But the chancellor found that Alex had taken on this responsibility since Heather’s father committed suicide in February 2005. There was testimony that following her father’s death, Heather suffered from depression, began habitually smoking cigarettes, stopped going to church, and stopped doing many of the household chores she had previously done. Alex testified that when she was not at work, Heather would lie around and insist that she be left alone, leaving him to care for the children. Alex stated that since February 2005, he had assumed the role of the children’s primary caregiver. The chancellor found that since her father’s suicide, Heather’s mental health and parenting skills had not fully recovered.
¶ 25. Heather admits that she suffered from depression after her father’s death, but she disputes Alex’s testimony that he ever took a leading role in caring for the children. While she acknowledges that Alex did more for the children after her father’s death, she maintains that it was only more than he had been doing before. Heather characterized Alex as detached from the children and the home life. She also testified that she had sought professional help for her depression and was treated by a psychiatrist for a few months. After about six months, she had largely recovered. Several of her witnesses, including her mother and sister, agreed. While Heather does not dispute that the health of the parties slightly favors Alex, she urges that the chancellor placed too much emphasis on her depression, from which she had largely recovered by the time of trial.
¶ 26. We acknowledge that Alex’s testimony on the issue of child care was largely uncorroborated, but we think that it alone provides substantial evidence for the chancellor’s findings on this issue. Heather is correct that there is significant testimony from several witnesses supporting her recovery from depression, but it creates only a factual dispute. “Where there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation.” Bowen v. Bowen, 982 So.2d 885, 395 (¶ 42) (Miss.2008) (quoting Sproles v. Sproles, 782 So.2d 742, 747 (¶ 16) (Miss.2001)) (internal quotations omitted). Also, while Heather points out that it was essentially undisputed that she was the children’s primary caregiver in the early years of the marriage, we think the chancellor was correct in focusing her analysis on more recent years.
¶ 27. And, as the chancellor noted, Heather’s assertion that she had largely recovered after six months was contradicted by various facts that she and her witnesses admitted. For example, Heather’s mother repeatedly stated in her testimony that Heather’s hysterectomy had contributed to her depression, but Heather testified that the hysterectomy was performed in July 2006, nearly a year and a half after her father’s death. Heather continued to smoke cigarettes habitually, and while she had once been active in the children’s church, it was nearly undisputed that she had largely or entirely stopped attending by the time of the trial. Nearly all of the witnesses also acknowledged that, since her father’s death, Heather no longer kept her home tidy. This continued after the separation, when Heather and the children moved into a house owned by Heather’s *146 grandmother. Heather’s witnesses generally described the home as “messy,” but others were not so kind. Lonnie Broom, the ex-husband of Heather’s friend and neighbor Heather Broom (Broom), described the home as “nasty,” with “garbage everywhere” inside. He testified that he and Broom had, several times, helped to clean it up. On one occasion, they had to remove four bags of garbage before they could vacuum the floor. There was also testimony that Heather’s home was in some degree of disrepair and was not being properly maintained, apparently because Heather could not afford to do so. Alex alleged that the children had complained that while staying with Heather, they were often fed nothing but instant noodles.
¶ 28. The chancellor also found that both parents, while working full time, would require assistance to get their children to and from school. Alex had successfully relied on his mother, who lived with him after the separation, and his aunt and uncle who lived close by, to carry the children to and from school. On the other hand, Heather had difficulty getting the children to and from school. After the separation, Heather was teaching in McComb while the children were attending school at Salem, about half an hour away. Heather had relied on her aunt and her neighbor, Broom, to take the children to and from school, respectively. There was testimony that, while in Heather’s custody after separation, the children had numerous unexplained absences and tardies.
¶ 29. It was also stated that Broom did not have room in her vehicle to seat the children safely. She was transporting a total of five, six, or seven children, according to various accounts. Broom testified that she had the children share seatbelts, and another witness observed that none of the children had used booster seats. Between the first and second days of the trial, Broom lost custody of her children and moved away; Heather testified that she was forced to quit her job so she could pick up the children from school. On the second day of trial, Heather accused Broom of stealing a significant sum of money after she had entrusted Broom with her debit card to purchase gasoline. Heather testified that this had caused her to miss various payments and bounce checks. Broom denied these allegations in her testimony.
¶ 30. The chancellor was skeptical of Heather’s explanations and found that these various events formed a pattern of questionable behavior that called into question Heather’s ability to care effectively for the children. Heather offers no meaningful response on appeal, except to urge this Court to re-weigh testimony from the trial. That is beyond the scope of our review; we are only called upon to determine whether the chancellor’s findings on these factors are supported by substantial evidence. We find that they are.

D. Stability of the Home and Employment

¶ 31. The chancellor found that these factors favored Alex. Alex had remained in the marital home after the separation and had held substantially the same job since 2001. He had the nearby support of his mother, his stepfather, and his aunt and uncle. The chancellor found that the children were doing well in their present school, church, and community. On the other hand, the chancellor was critical of both Heather’s employment and the stability of her home. On appeal, Heather concedes that this factor may have favored Alex to some degree, but she takes issue with many of the chancellor’s findings.
¶ 32. The chancellor found that Heather had repeatedly changed jobs, without an *147 adequate explanation. Prior to the separation, Heather taught special education at Salem Elementary, where the parties’ children attended. She resigned from that position about two weeks into the 2007-2008 school year. Heather testified that she had been uncomfortable working at Salem and that the principal, Charles Boyd, was Alex’s relative and had been “taking sides” in their divorce. Boyd was called to testify in response. He acknowledged that he and Alex were friends, but he denied that they were related; instead, Boyd stated that they were neighbors and that he had been a friend of the family for many years. Boyd also denied taking sides in the divorce or pressuring Heather regarding the marriage; he stated that Heather had asked to quit, and he had allowed her to break the contract because she had an unusually high number of absences — eighteen and one-half — over the course of the previous school year. Heather offered no explanation for the absences.[4]
¶ 83. Shortly after resigning from Salem Elementary, Heather began teaching in McComb. On the first day of trial, November 1, 2007, Heather testified that she intended to move the children to McComb, nearer to her work and her mother, who had testified that she could assist Heather with the children if Heather lived nearby. Heather planned to enroll the children in the McComb schools at the start of the next school year. But by the second day of trial, February 28, 2008, Heather had resigned from her teaching position in McComb, and she renounced her plans to move the children there. Heather explained that she had quit her job in McComb because she had no one to pick her children up from their school in Salem after her neighbor Broom moved away. Heather testified that after quitting her teaching job she was making about six hundred dollars per month tutoring. She also claimed to have accepted a teaching position at nearby Tylertown Elementary, which would begin in August, though she admitted that it was “too early” to have a contract.
¶ 34. The chancellor was, again, skeptical of Heather’s explanations. The chancellor noted that both parents would have to work to adequately support their four children, but she expressed doubts that Heather would be able to work full time and care for the children by herself. The chancellor found Heather’s employment difficulties to be particularly troubling since Heather had the capacity to earn more money than Alex. The chancellor was also critical of Heather’s “financial irregularities” — there was testimony that, even before she quit her job, Heather had been bouncing checks, had not been maintaining her grandmother’s home where she lived, had not paid the rent for a storage unit where she had placed marital property assigned to Alex under the temporary order, and had taken money from a savings account set aside for one of the children. Alex also testified that Heather had abandoned her van after it broke down at a gas station. He had been called, as the registered owner, after it had been left there for a week. Alex got the vehicle and repaired it, but he testified that Heather had borrowed a vehicle from her mother and showed no interest in getting her van back. At some point, Heather came to the former marital home, unannounced accord *148 ing to Alex, while he was at work. But when she was unable to find the keys to the van, Heather took Alex’s truck instead.
¶ 35. On appeal, Heather argues that the chancellor unfairly held Heather’s financial difficulties against her in light of her explanations and the fact that Alex did not pay child support for three months, starting after the first day of the divorce trial. The temporary order provided for $400 per month in child support. Alex testified that he had cared for the children most of the days during those months (apparently November, December, and January) and could not afford to pay Heather child support while actually supporting the children himself. Both parties agreed that on the second day of the trial (February 28), Alex paid Heather the $1,200 owed as back child support. In her order granting the divorce, the chancellor assessed Alex with $1,000 in attorney’s fees on Heather’s contempt motion.
¶ 36. The chancellor acknowledged that the unpaid child support may have contributed to Heather’s financial difficulties, but she could find no explanation for Heather quitting her teaching job, particularly at a time when she was having financial difficulties. The chancellor found that this would have a much greater impact on Heather’s ability to support the children than the missed child support payments.
¶ 37. While critical of Alex’s failure to pay child support, the chancellor praised the stability of his employment and home life. She noted that Alex had remained in the same area all of his life and that, while the children lived with Alex, they had the support of Alex’s mother, stepfather, aunt, and uncle. The chancellor contrasted this with Heather’s difficulty finding reliable help to care for the children after the separation. Alex’s mother and stepfather lived with him after the separation, and at the time of the divorce trial, they were building a home close by. The chancellor found that, if placed in Alex’s custody, the children would remain in the same community and attend the same school and church; but if placed in Heather’s care, they would probably be forced to move away.
¶ 38. We find the chancellor’s decision that this factor favors Alex supported by substantial evidence.

E. Moral Fitness

¶ 39. The chancellor found that this factor favored Alex. In her testimony, Heather admitted that, after the separation, she had a sexual relationship with a married man, Thomas Spence. There was testimony that Heather and Spence had been together around the children. Heather denied any other affairs, but another man, Brad Gatlin, testified that he had met Heather on the Internet some time prior to the separation. After the separation, Gatlin stated, he and Heather had sexual intercourse in her home on several occasions, while the children were in another room. On one occasion, the children had witnessed Heather and Gatlin kissing. Gatlin also testified that Heather had confessed a sexual relationship with a third man that had occurred shortly after the separation.
¶ 40. Heather characterized her relationship with Gatlin differently — she stated that they were friends and that she had seen Gatlin on several occasions so that her children and his could play together. Heather admitted that Gatlin had courted her and kissed her, once; and she acknowledged that her children had seen it. But Heather claimed to have rejected Gat-lin’s advances and attempted, unsuccessfully, to “set him up” with some of her friends. After she started seeing someone else, Heather testified, Gatlin repeatedly threatened to kill himself.
*149 ¶ 41. The chancellor apparently found Gatlin’s testimony more credible, and she faulted Heather for exposing the children to the extramarital relationship. On appeal, Heather urges this Court to disregard Gatlin’s testimony and accept her account, but we think it was clearly the chancellor’s province to decide whose account was credible. Heather also argues that the chancellor erred in weighing this conduct against her history of participating in the children’s church activities. She also points out that her and Alex’s first child was born out of wedlock. Again, this Court cannot reweigh the evidence on appeal. We are limited to determining whether the chancellor’s findings are supported by substantial evidence.
¶ 42. Heather also suggests in her brief on remand that the chancellor “punished” her for the adultery by awarding Alex custody of the children. We acknowledge that under our law a chancellor may not use marital fault as a sanction in custody awards. Albright, 437 So.2d at 1005. The chancellor should consider adultery as part of moral fitness, one of the Albright factors, and moral fitness must be “only one factor when considering what was in the best interest and welfare of the children.” Brekeen v. Brekeen, 880 So.2d 280, 284 (¶ 6) (Miss.2004) (citing Carr v. Carr, 480 So.2d 1120, 1123 (Miss.1985)). Our courts have not been reluctant to reverse custody decisions where the chancellor placed too much weight on one parent’s sexual misconduct while disregarding the other Albright factors. But after a thorough review of the record and the chancellor’s findings, we are satisfied that this is not the case. Although her discussion of moral fitness was brief in both opinions, the chancellor was careful to emphasize that Heather was faulted for exposing the children to extramarital relationships; Heather was not faulted for simply engaging in adultery. In finding that the moral fitness factor favored Alex, the chancellor also cited his leading role in the children’s religious education in recent years.
¶43. It is plain from the record that the chancellor made extensive findings on the other factors, supported by substantial evidence, while only noting the adulteries briefly and in the context of their impact on the children. That being the case, Heather does not argue that the chancellor expressly placed too much weight on her adultery or failed to consider the other Albright factors. Instead, Heather insinuates that her adultery caused the chancellor to discredit her testimony and to weigh the evidence on the other Albright factors unfairly against her. After thoroughly reviewing the record, we can find nothing to support this allegation.
¶ 44. We find the chancellor’s decision on this factor supported by substantial evidence.

F. Other Factors

¶ 45. In this factor, the chancellor addressed the domestic violence incident and other allegations. The chancellor largely accepted Heather’s account of the September 2005 incident, finding that Alex had thrown Heather to the ground and struck her twice with a belt. Although Alex’s conduct was “inexcusable,” the chancellor noted that it had occurred at a stressful time and that both parents had acted outrageously in challenging each other’s au7 thority over the children. The chancellor concluded that it was an isolated incident and that, weighed against the other Al-bright factors, it did not justify awarding custody of the children to Heather.
¶46. Heather argues on appeal that, while there was perhaps only one violent incident, it was part of a greater pattern of Alex’s misbehavior. Heather notes that she had testified that Alex was an alcoholic and had problems controlling his anger. *150 She alleged that by the end of the marriage, Alex would drink every day and that she had begged him to seek counseling. The chancellor does not appear to have found this testimony to be credible, as she specifically addressed and rejected Heather’s suggestion that Alex needed treatment for alcoholism. This appears to be supported by substantial evidence. Several witnesses testified that Alex only drank occasionally, and Heather’s testimony about Alex’s habitual alcohol use consisted almost entirely of broad generalizations.
¶ 47. Heather also alleged that Alex had an “anger problem” that required treatment. As the dissent notes, Heather leveled many allegations against Alex. She accused Alex of, among other things, being emotionally abusive, criticizing her appearance, questioning her intelligence, making misogynistic comments, questioning the paternity of the children, suggesting that she should terminate the pregnancies of the later children by abortion, and starting arguments for no apparent reason. Alex disputed much of this testimony. He accused Heather of being the principal instigator of their fights and opined that she was the one who needed counseling. It should be noted that neither parent accused the other of acting angrily toward the children, only toward each other in the children’s presence.
¶ 48. The chancellor did not accept either party’s claims that the other was responsible for their marital difficulties. Instead, she was critical of both parents’ conduct toward each other, particularly their willingness to expose the children to their arguments. In the chancellor’s view, this did not favor either party. The record supports this conclusion. As the trier of fact, the chancellor is the judge of the credibility of the witnesses, and she decides the weight of their testimonies. Bowen v. Bowen, 982 So.2d 385, 395 (¶ 42) (Miss.2008). This Court cannot re-weigh this testimony on appeal.
¶ 49. The decision as to where the children’s best interest lies is entrusted to the chancellor’s sound discretion, which cannot be disturbed absent a clear showing of an abuse of that discretion. We are satisfied that the chancellor thoroughly considered the evidence offered on the Albright factors and that her findings are supported by substantial evidence. We can find no error in the chancellor’s decision awarding Alex custody of the children.
¶ 50. THE JUDGMENT OF THE CHANCERY COURT OF WALTHALL COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, P.J., IRVING, GRIFFIS, ISHEE, ROBERTS, AND MAXWELL, JJ„ CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION. KING, C.J, NOT PARTICIPATING.

. Alex testified that the marital home was about 40% complete at the time of the marriage and was built on land he owned prior to the marriage. Alex acknowledged that Heather and her father had also worked on the house, hanging drywall.

. Heather described the incident at trial and stated that she had filed charges with the local sheriff's department. There was no testimony elaborating on any final disposition of the charges. The record does contain a printout from a computer database styled "CRIMINAL AFFIDAVIT.” The document appears in the record as an exhibit without any clear foundation. Nonetheless, it appears to indicate that Alex was convicted of simple assault, noting that he had forfeited a cash bond of $629. It is not clear from the document whether Alex was convicted by plea or by trial.

. In her principal brief, Heather urged that the proof showed that she had a closer emotional bond with the children. In her later brief on remand, she conceded that the chancellor's finding that this factor favored neither parent was supported by substantial evidence. Heather takes contradictory positions on several other factors, all without explanation. We will consider a concession in either brief to be binding.

. Heather’s attorney, while cross-examining Boyd, suggested that some of the absences resulted from a car accident where one of the children was injured. Boyd stated that he remembered the accident and that the child had been injured, but he could not recall whether this had caused Heather to miss work. No other testimony addressed Heather's absences while teaching at Salem.