IRVING, P.J.,
dissenting:
¶ 28. The majority finds that the chancery court did not err in awarding custody of Britney, Irle’s oldest child, to the Fosters, Britney’s paternal grandparents. Because I believe that the chancery court’s determinatión — that the evidence presented by the Fosters clearly rebutted the natural-parent presumption accorded Irle — was manifestly wrong and clearly erroneous, I dissent. I would reverse and render the judgment of the chancery court.
¶ 29. It is well established that“[i]n [a] custody battle[ ] between a natural parent and a third party.... the third party must first clearly rebut the natural-parent presumption[.]” In re Smith, 97 So.3d 43, 46 (¶ 8) (Miss.2012) (internal citations omitted). The evidence must dearly show that either (1) “the [natural] parent has abandoned the child; (2) the [natural] parent has deserted the child; (3) the [natural] parent’s conduct is so immoral as to be detrimental to the child; or [that] (4) the [natural] parent is unfit, mentally or otherwise, to have custody.” Id. at (¶ 9) (citing Carter v. Taylor, 611 So.2d 874, 876 (Miss.1992)). Here, the chancery court determined that Irle’s conduct was so immoral as to be detrimental to Britney. With the utmost respect to the majority, I must say, based on my review of the record, that the record does not contain clear evidence of immoral conduct on the part of Irle that is detrimental to Britney.
¶30. The chancery court focused on Irle’s alleged drug abuse and conduct that the court viewed as sexually promiscuous. I quote extensively from the chancellor’s bench opinion:
Now, where does that put this [c]ourt in this case today. The [c]ourt,- taking those considerations into account, this [c]ourt has noted the guardian ad litem found that the mother is not mentally unfit, that she’s not abandoned or deserted this child, or that she is morally unfit and so held that she was not such. But I have to take exception to the guardian ad litem’s report in this re.spect. This [c]ourt does hereby find that the mother is morally unfit to claim the benefit of .the natural parent presumption.
Now, I’ll get into the factors under Al-bright a little later and dwell more fully upon that, but the [c]ourt so finds under this case that even going back — this was brought out in the trial of this case and unobjected to by the parties — that she has four out-of-wedlock children. That the boyfriend, Mr. [Gary] Voyles ... was the one who occasionally visits with [her] or she came over to see him with these two children, spent the night there. She said there’s no sexual involvement and he did, too. But, you know, Mr. Voyles was as nervous as a cat on a hot tin roof when he testified here. It’s interesting to me, as a matter of comment, that the mother this morning testified that they got their divorces the same day from their respective spouses. No wonder he was nervous on the witness stand that day. They both got their divorces from their respective spouses, as evidenced by her testimony here today, and it was brought out in the proof, March 6, 2012, after this case had been recessed for a period of time. Furthermore, this [c]ourt finds that she has actually failed one drug test, a cocaine test administered in October of 2011, by the guardian ad litem. Even though, admittedly, she passed the one the next day when she hired a separate firm to do it. She was visiting with and *33 taking the children in the presence of a married man while she was still married to another man. This [c]ourt find[s] that she’s morally unfit to claim the benefit of this natural parent presumption.
I now turn to a discussion of the evidence as reflected in the record.

1. Alleged Drug Use

¶31. Throughout trial, the chancery court heard testimony regarding Irle’s suspected drug use. Her second daughter’s father testified that on one occasion he met Irle at a motel room and saw drugs in the. bathroom. He also stated that Irle was so intoxicated that she could not drive herself to pick up her youngest son from his father. Additionally, Darlene Braswell, Irle’s former roommate,, testified that on one occasion when she and Irle lived together she found, in her bathroom, a straw with white powder on the tip. She suspected that Irle had used this straw to ingest drugs, which made Irle sleep approximately four days. The GAL reported that Irle had tested positive for cocaine on, a drug test performed in his office.
¶32. What is missing from all of the allegations of Irle’s alleged drug use is definitive evidence that what the witnesses saw was in fact illicit drugs. In the case of the father of Irle’s second daughter, there is no evidence that any of the alleged drugs that he saw in the bathroom were in fact contraband. None of the alleged drugs were tested, and there is no evidence that he was competent to identify illicit drugs. As to the former roommate, her testimony was sheer speculation, nothing more. Further, neither witness actually saw Irle using drugs. Britney testified that she has never seen her mother intoxicated. Patrick Irle, Irle’s brother with whom she allegedly uses drugs, testified that he had never seen Irle use drugs and that he had not used drugs with her. Also, the day after receiving a positive reading on the drug test administered by the GAL, Irle passed a drug test given by' professionals at a toxicology screening laboratory.
¶ 33. Based on my review of the record, there is no dear evidence that Irle has ever used drugs. But accepting that she has, there is no evidence that Irle’s alleged conduct has detrimentally affected Britney. This host of unsubstantiated allegations against Irle is insufficient to deprive her of the natural-parent presumption.

2. Alleged Sexual Promiscuity

¶ 34. As additional justification for depriving Irle of the benefit of the natural-parent presumption, the chancery court cited Irle’s relationship with Voylés. While separated from her husband, but still legally married, Irle met and began spending time with Voyles, who was also separated from his spouse. Irle and Voyles define their relationship as a nonsexual friendship.' During the early stages of her relationship with Voyles, Irle had several overnight 'visits at Voyles’s home. Irle took Britney with her on these visits. Irle and Voyles stated that during these overnight visits, Britney slept in one of the bedrooms, Voyles slept in his own bedroom, and Irle slept on the couch. There is no testimony to the contrary. Yet, the chancery court concluded that Irle and Voyles were engaged in a sexual relationship.
¶ 35. Despite what the chancery court thought about Irle and .Voyles’s relationship, “under Mississippi law, the [chancery court] may not make a finding that a custodial parent is morally unfit merely because she has sexual relationships outside of. marriage[.]” Glissen v. Glissen, 910 So.2d 603, 611 (¶ 27) (Miss.Ct.App.2005). Thus, even if the chancery court suspected *34 that Irle and Voyles were being less than truthful about their relationship, “[a]bsent a finding of some conduct harmful in a more specific sense than the certain knowledge of sexual relations!!,] ... custody cannot be withheld on that basis.” Id. at 611-12 (¶ 27) (quoting Sullivan v. Stringer, 736 So.2d 514, 517 (¶ 16) (Miss.Ct.App.1999)). There is no evidence that Britney has witnessed any acts of intimacy between Voyles and Irle. Moreover, there is no evidence that Irle’s. relationship with Voyles, whatever its status, has had a detrimental effect on Britney.
¶36. The majority cites S.C.R. v. F.W.K., 748 So.2d 693, 700-01 (¶ 43) (Miss.1999), and Brumfield v. Brumfield, 49 So.3d 138, 149 (¶ 42) (Miss.Ct.App.2010), to support its decision that the chancery court correctly determined “that Irle’s having four children outside of marriage, as well as living with a man while she and the man were both married to other people, set a bad moral example for pre-teen Britney.” Maj. Op. at (¶ 15). First, neither case addresses having children outside of wedlock. Regardless, “[o]ur focus should not be on the past wrongdoing of the [mother] but, rather, on what is in the best interest of the child in the present[,]” Williams v. Stockstill, 990 So.2d 774, 778 (¶ 16) (Miss.Ct.App.2008); and there is no evidence that having additional brothers and sisters, despite the circumstances surrounding their births, has had a detrimental effect on Britney. Secondly, the “immoral conduct” exhibited by the parents in S.C.R. and Brumfield is distinguishable from the alleged immoral conduct in the case before this Court. In S.C.R., a father encouraged his son to make a false report of sexual abuse against the child’s maternal uncle. S.C.R., 748 So.2d at 701 (¶ 43). In Brumfield, there was testimony that the mother had engaged in numerous extra-marital affairs. Brumfield, 49 So.3d at 148 (¶¶ 39-40). Furthermore, the mother admitted that the relationships were sexual and that her children had seen her with her boyfriends. Id.
¶ 37. Here, it is clear that Irle and her husband were separated when she began talking to Voyles. Nevertheless, there is no evidence that the relationship between Voyles and Irle is anything other than a platonic relationship. The chancery court inferred that the two were engaged in a sexual relationship because the dates of their divorces from their respective spouses coincided. However, there is no evidence to justify such an inference. More importantly, there is no evidence that Irle’s platonic relationship with Voyles has been, is, or will be detrimental to Britney. And despite what the majority says, the chancery court made no such finding. After deciding that Irle would not retain the natural-parent presumption, the chancery court immediately began an Albright[4] analysis.
¶ 38. It is clear from the record that Irle loves her daughter. It is clear from the record that Irle has made mistakes in the past. What is missing from the record is clear evidence that Irle has acted so immorally as to justify taking her daughter away from her. For the reasons stated, I dissent.
JAMES, J., JOINS THIS OPINION.

. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).