

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00264-CV

NORMA SANO                                                            APPELLANT

V.

JIMMY J. GREENLEE                                                      APPELLEE

----------

FROM THE 322ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In two issues, Appellant Norma Sano appeals the trial court's designation of Appellee Jimmy J. Greenlee as joint managing conservator with the exclusive right to establish their child's primary residence in its divorce decree. We affirm.

## II. Factual and Procedural Background

After three years of litigation, the trial court granted the parties' divorce, appointed Sano and Greenlee as joint managing conservators of their five-year-

---

[1]See Tex. R. App. P. 47.4.

old son Calvin,[2] and awarded to Greenlee the exclusive right to determine Calvin's primary residence. The trial court's findings of fact and conclusions of law included the following:

FINDINGS OF FACT

1.    Jimmy J. Greenlee and Norma Sano were common law married in April of 2003.

2.    There was one child born of this marriage. That child was [Calvin], a male, born on October 23, 2004, in Tarrant County, Texas.

       . . . .

4.    The Court finds that the mother, Norma Sano, is unemployed, and draws a social security disability check.

5.    The Court finds that the father is employed.

6.    The Court finds that two social studies have been filed in this case.

7.    The Court finds that the mother did not have a driver's license at the time of trial.

       . . . .

9.    The Court finds that the mother has questionable functioning and reasoning abilities.

10.   The Court finds that the parents should be named joint managing conservators . . . .

11.   [Calvin's] needs are better met and that it is in the best interest of the child for the father to be the Joint Managing Conservator with the exclusive right to establish domicile within Tarrant and Contiguous counties.

---

[2]We use an alias to protect the child's identity. *See* Tex. Fam. Code Ann. § 109.002(d) (West 2010).

12. The Court finds that the domicile of the child should be restricted to Tarrant County, Texas and adjoining counties.

. . . .

18. The Court finds that the parties' families reside in El Paso, and that Norma Sano desires to move to El Paso with the child.

. . . .

CONCLUSIONS OF LAW

. . . .

5. Based upon the evidence, I conclude as a matter of law that Common Law Marriage of the parties took place in April of 2003.

6. Based upon the evidence, I conclude as a matter of law that Jimmy J. Greenlee and Norma Sano should be appointed Joint Managing Conservators, and that it is in the best interest of the minor child that the father, Jimmy J. Greenlee, be appointed Joint Managing Conservator of the child, [Calvin] with the exclusive right to establish domicile.

7. Based upon the evidence, I conclude as a matter of law that the child's residence should be restricted to Tarrant County and adjoining counties and find that this is in the best interest of the child.

. . . .

9. The Court considered the following factors in making a determination of a just and right [community property] division[3]:
   a. Norma Sano's disability;
   b. Norma Sano's inability to be gainfully employed;
   c. Norma Sano's duties as a homemaker during the entire duration of the relationship between her and Jimmy Greenlee; and

---

[3]In Finding of Fact #24, the trial court set out its community property division, including an award of 25% of the community balance of Greenlee's retirement fund to Greenlee and 75% of it to Sano.

3

        d.      Norma Sano's disparity of earning power and means of support.

        . . . .

11.    Based upon the evidence, I conclude that Norma Sano should not pay any child support at this time because she is unable to do so because of her disability.

Because Sano complains of the legal and factual sufficiency of the evidence to support the trial court's decision to award the right to establish Calvin's primary residence to Greenlee and to support Fact Finding #9, we will address the evidence related to these issues within our analysis below.[4]

## III. Discussion

In her first issue, Sano complains that the trial court abused its discretion by designating Greenlee as Calvin's joint managing conservator with the right to establish Calvin's primary residence because the evidence was legally and factually insufficient to support this decision. In her second issue, Sano argues that the trial court deprived Sano of a fair trial and violated her constitutional rights by considering Sano as disabled or intellectually impaired when the evidence was legally and factually insufficient to support this finding.

## A. Standard of Review

We review the trial court's decisions on custody, control, possession, and visitation matters for an abuse of discretion. *In re M.M.M.*, 307 S.W.3d 846, 849

---

[4]Sano does not appeal the portions of the judgment granting the divorce or dividing the parties' community property.

4

(Tex. App.—Fort Worth 2010, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620. And an abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). However, in a review of a child custody ruling, "legal and factual sufficiency are not independent grounds of error but are

5

relevant factors in deciding whether the trial court abused its discretion." *M.M.M.*, 307 S.W.3d at 849. We consider whether (1) the trial court had sufficient information upon which to exercise its discretion and (2) whether it erred in its application of that discretion. *Id.* The first question is subject to a traditional sufficiency review; we determine in the second question whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.* A trial court is given wide latitude when determining the best interest of the child and will only be reversed if it appears from the record as a whole that the trial court abused its discretion. *Gillespie*, 644 S.W.2d at 451.

## B. Evidence

### 1. Jimmy Greenlee's Testimony

At the time of trial in 2010, Greenlee was a forty-two-year-old high school graduate who had worked for AT&T for ten years. Prior to working for AT&T, he spent around nine years in the United States Navy. Greenlee testified that Sano was disabled when he met her, that they started living together in 1996, along with Sano's then-ten-year-old daughter from her prior marriage,[5] and that they were not common law married until April 2003, based on filing their 2004 income tax return jointly as married. Greenlee said that 2004 was the only time they had filed jointly as married because Sano wanted to retain her Social Security

---

[5]During trial, Sano described her daughter as a twenty-four-year-old high school graduate who was married and in college.

6

Insurance (SSI) disability payments.[6]  The parties lived together for seven years before Calvin was born.

Greenlee testified that Calvin is delayed in speech and development, and the trial court admitted into evidence Calvin's December 2007 speech therapy evaluation by a speech pathologist.  The evaluation reflects that the speech pathologist diagnosed Calvin with profound articulation disorder, severe-to-profound receptive and expressive language disorder, and speech delay. Greenlee stated that Calvin has been improving; that he has been working with Calvin on his colors, shapes, numbers, and letters at Calvin's teacher's request; and that Calvin needs interaction with other children to help with his speech.  At the time of trial, Calvin attended the Weldon Hafley Development Center, in the Eagle Mountain School District, for four hours a day; Greenlee said that he would send Calvin to regular kindergarten the following school year if that is what was recommended at the end of the school year.

During Greenlee's testimony, the trial court admitted the following into evidence:

- An April 6, 2007 letter from the Social Security Administration (SSA) to Sano, stating that effective February 2004, she was no longer eligible to receive SSI benefits.

- A 2009 favorable ruling from the SSA to reinstate Sano's SSI benefits and the March 17, 2009 decision by the administrative law judge (ALJ), including the ALJ's findings of fact and conclusions of law.

--------

[6]Similarly, Sano testified that she had wanted to marry Greenlee but could not "because of [her] SSI."

- A photograph of Calvin's room at Greenlee's house, and a photograph of Calvin's dog at Greenlee's house.

- Greenlee's certificates of completion for two parenting courses.

Greenlee stated that he wanted Calvin's domicile to remain in Tarrant County, where he lives, and that he wants to get Calvin involved in Cub Scouts and sports. Greenlee has a house and a car; he stated that Sano does not drive. He requested that Sano be given extended visitation like Greenlee had had during the pendency of the divorce and said that he made this request in Calvin's best interest.

### 2. Norma Sano's Testimony

At the time of the trial, Sano was Calvin's primary caregiver. Sano stated that she had been receiving SSI disability payments since 1988 and stated that her disabilities include a Torkildsen shunt in her head and epileptic seizures controlled through medication. In 1988, she was in a coma for seven months, and calcification build-up during the prolonged coma led to a loss of range of motion in her right elbow. Sano said that her last seizure was in 2006 but then said that it had just been a strong dizzy spell and that she could not recall the last time she had had a seizure. She had a seizure in 2004 while she was under observation at the hospital, prior to giving birth to Calvin. Sano did not finish high school, and she testified that she had never been employed while she and Greenlee were together.

Sano admitted that the ALJ had made a finding that she had borderline intellectual functioning.[7] She also admitted telling the SSA that she was unable to sit, stand, or walk for long periods of time due to pain, headaches, weakness, and side effects from her medication—which included fatigue and sleepiness—and that she also suffered from depression and chronic right elbow pain. Sano stated that she could take care of Calvin because she was on medication. With regard to Sano's disabilities, the following dialogue occurred between Sano and her attorney during Sano's testimony:

Q. One real quick concerning your disability status. You have been—it has been determined by the government that you are not capable of maintaining full-time employment, correct?

A. Yes.

Q. It has not been established by the government that you're not capable of taking care of your son, correct?

A. Yes.

Q. You touched on it a little earlier that at work, if you get tired, you just can't expect a boss to let you go sit down and find a quiet place to sit down, correct?

A. Yes.

Q. But while you're taking care of your son, if you get tired or you need to sit down, nobody is there to boss you around to say you can't do that, correct?

[7]When asked by Greenlee's attorney about the borderline intellectual functioning, Sano asked the trial court if she could respond to that, and the trial court told her, "Your attorney will take care of that." Then Greenlee's attorney asked, "That's what the Social Security Board found for you though, right?" and Sano replied, "Yes."

A. Yes.

Q. Is that what you're saying?

A. Yes.

Q. Is that what you want the Court to understand?

A. Yes.

Sano noted that the issue of her child-raising ability was not discussed with the SSA in determining her eligibility for disability benefits. The SSA had Sano undergo a psychological evaluation, and she admitted that she had discussed a cognitive adjustment disorder with the psychologist.

With regard to Calvin's speech and development delays, Sano testified that her son is fine and just "a little bit behind" in his speech, but she admitted that Calvin did not finish potty-training until age four. Sano said that she wanted Calvin to be around other children but that it was just her and Greenlee living in the area.

Sano testified that she does not like to drive but that she knows how to drive. In response to Greenlee's attorney's question, "You don't have a driver's license?" Sano replied, "No, I don't like to drive." Sano said that she could take Calvin places by calling friends who are willing to drive her.

Sano testified that she would like to move with Calvin to El Paso to be closer to both parties' relatives. Specifically, the following dialogue occurred between Sano and her attorney during Sano's testimony:

Q. Listen to my question. Why do you want the restriction from Tarrant County taken off so that you can move?

A. To El Paso.

Q. You want to move to El Paso?

A. Yes . . . Because both families for [Calvin] are over there, both grandmas.

Sano clarified that she meant that Greenlee's mother and Sano's mother were both in El Paso. Sano stated that if the geographic restriction were removed, she would be willing to pay for one plane ticket a month so that Calvin could visit his father, and she proposed that Greenlee pay for any additional plane tickets per month.

At the close of Sano's testimony during Greenlee's case-in-chief, the trial court asked her some questions, including whether she was on Medicaid and whether she went to Mental Health Mental Retardation (MHMR), whether her daughter also had developmental problems, and what kind of extracurricular or organized activities Calvin was involved in that would allow him to interact with other children. Sano said that she was on Medicaid, said "yes" to MHMR, and said that her daughter did not have developmental problems and made As and Bs in high school. Sano stated that Calvin played "a lot in the house," that he did not have any friends, and that she did not yet have him in any group activities, although she was thinking of putting him in extra time at the YMCA. Finally, the trial court asked her about driving:

11

THE COURT: Well, let me go into this. You say you don't care to drive, right? You don't like to drive?

[SANO]: No, I don't like to drive.

THE COURT: But you could drive?

[SANO]: Yes.

THE COURT: You could have a driver's license right now, right?

[SANO]: Yes.

THE COURT: I don't care to cook, but there are some things that I think for the betterment of other members of the family you have to do regardless. Do you consider driving a necessity in today's world?

[SANO]: Well, it's because I --

THE COURT: No. You don't consider it a necessity?

[SANO]: No.

Sano complained during Greenlee's case-in-chief and in her own case that Greenlee did not take Calvin to the doctor or dentist when she asked him to, that he did not keep her adequately informed about Calvin's health when Calvin stayed with him, and that Calvin was always sick when Greenlee returned him to her. Specifically, Greenlee dropped Calvin off wearing a cast after Calvin broke a bone at McDonald's instead of notifying her when it happened; Sano's brother took Calvin to the doctor when Calvin had pneumonia; Greenlee did not tell her when Calvin had asthma but instead just returned the child on a Monday morning with his medication; and almost once a month, Greenlee would return Calvin home sick and then she would have to take him to the doctor. Sano said that

12

she does not contact Greenlee when she takes Calvin to the doctor because Greenlee does not call her when he takes Calvin to the doctor and because Greenlee already knows that the child is sick when he drops Calvin off. Sano also complained that Calvin had to go to school tired when Greenlee would return Calvin to her at 6:30 a.m. so that Greenlee could get to work at 7 a.m.

### 3. Additional Testimony

After Sano finished her case-in-chief, the trial court asked Greenlee why he failed to notify Sano about Calvin's broken bone when he was at the hospital getting it fixed. Greenlee stated that the accident happened on a Sunday, and he brought Calvin to Sano in a temporary cast. Sano told him that he would have to take Calvin to the follow-up appointment—when the fracture was discovered and permanent cast put on—"since he got hurt during your time." The trial court then asked Sano additional questions, including whether she took pain medication. Sano said that she took Arthiotec once a day for pain in her back caused by arthritis.

### 4. Additional Evidence

Petitioner's Exhibit 15, the SSA's decision to reinstate Sano's SSI benefits, which set out the ALJ's findings and conclusions, was admitted in evidence without objection. The ALJ's findings included the following:

> 4. The claimant has the residual functional capacity to perform sedentary work . . . except that she cannot sit, stand, or walk for long periods of time and is unable to work 8 hours a day, 40 hours a week, secondary to fatigue, pain, and weakness.

13

. . . .

The record reflects that the claimant has been diagnosed with seizures controlled with medications, shunt placement in brain to control pressure, loss of range of motion and strength of right elbow, depressed mood and anxiety, back pain, and borderline intellectual functioning. To further develop the case the Administration sent the claimant to Enrique Porras, M.D. on May 15, 2007 for internist consultative examination. The claimant presented with seizures, high blood pressure, and arthritis. The claimant report[ed] being involved in a motor vehicle accident in 2004 which resulted in arthralgias affecting the right side and tailbone. X-rays indicated arthritis and evidence of trauma. She is able to sit for no more than one hour without pain from hip and tail bone. . . . Dr. Porras diagnosed the claimant with right elbow arthralgia due to degenerative joint disease, coccygeal pain, seizure disorder, clinical depression decompensated, arterial hypertension, hyperlipidemia, hypothyroidism, and chronic headaches.

The Administration also sent the claimant to Randall Rattan, Ph.D. for a psychological evaluation. Based on his examination, Dr. Rat[t]an diagnosed the claimant with cognitive disorder, NOS, adjustment disorder with mixed depressed mood and anxiety, and borderline intellectual functioning. . . .

The sealed record in this case contains a social study report dated June 12, 2007, that is based on interviews with Sano, Greenlee, and Calvin's babysitter and home visits with each parent when Calvin was with them, and a follow-up social study report covering interviews in September 2007.[8] The trial court took judicial notice that both reports were in its file, took judicial notice of its

_____

[8]A social study is an "evaluative process through which information and recommendations regarding . . . conservatorship of a child, or possession of or access to a child may be made to a court, the parties, and the parties' attorneys." Tex. Fam. Code Ann. § 107.0501(1) (West 2010). Under section 107.054, the agency or person making the social study shall file with the court a report containing findings and conclusions, and the report shall be made a part of the record of the suit. *Id.* § 107.054 (West 2010).

14

file, and stated that it had already reviewed them; it also took notice of Sano's objections to the social studies in her interrogatories and her request for production. However, Sano's interrogatories and her request for production were not included in the record on appeal, and she never secured a ruling on these objections. Neither party called the authors of the social study reports to testify, and many of the statements in the social study reports were cumulative of the evidence adduced at trial and set out above.

In the June 2007 report, the social worker found that Calvin seemed bonded with both parents, reported that Sano said she was not allowed to drive a car due to her seizures, and reported that Sano told her that Greenlee would not agree to change his visits with Calvin when she had to go to El Paso, so she went anyway. In her report, the social worker stated that she tried to explain to Sano that Sano "could not just do what she wanted" and stated that Sano did not seem to understand that Greenlee was entitled to his time and that it was improper for Sano to prevent him from having his access period just because she needed or wanted to do something else. Sano revealed to the social worker that she had called in a report to Child Protective Services (CPS) alleging neglectful supervision of Calvin by Greenlee, which CPS ruled out. The social worker concluded that Greenlee appeared to be the more stable of the two parents and recommended that the parents have joint managing conservatorship with Greenlee having primary custody with a geographical restriction to Tarrant County and Sano having standard access.

In September 2007, another social worker reported that during her home visits, Calvin appeared more verbal, compliant, and calm with Greenlee than with Sano. She noted that Calvin was in Greenlee's primary care and that Calvin appeared to be doing very well there. In both reports, the social workers observed that Sano appeared to have concerns about normal childhood injuries that did not warrant seeking medical attention.

## C. Analysis

In her first issue, Sano complains that the evidence is legally and factually insufficient to support the trial court's decision to designate Greenlee as the joint managing conservator with the right to establish Calvin's primary residence, arguing that the trial court improperly focused on her lack of a driver's license and drew inferences from her epilepsy and that the trial court "arbitrarily concluded that Sano was a person with a disability without proof that her impairment met the legal definition" under the Americans with Disabilities Act (ADA). In her second issue, Sano argues that the trial court deprived her of a fair trial and violated her constitutional due process rights by considering her as disabled or intellectually impaired when the evidence is legally and factually insufficient to support that finding. She claims that "[b]randing Sano as physically disabled and mentally diminished without affording her the opportunity to rebut such inferences amounts to an arbitrary and wrongful action by the court and a denial of fairness, as well as running the risk of erroneously depriving a parent of a protected right."

16

When determining issues of conservatorship, possession, and access to a child, the best interest of the child shall always be the primary consideration of the court. Tex. Fam. Code Ann. § 153.002 (West 2008); *In re C.A.P., Jr.*, 233 S.W.3d 896, 901 (Tex. App.—Fort Worth 2007, no pet.) ("Section 153.002 requires the court to always put the child's best interest first in matters of possession and access to the child."). If it is in the best interests of the child, the court may appoint both parents as joint managing conservators, but it must designate to one of them the exclusive right to determine the child's primary residence, with or without geographical restrictions. Tex. Fam. Code Ann. § 153.134(a), (b)(1) (West 2008). In determining which conservator will have the exclusive right to establish primary residence under section 153.134(b), the trial court is vested with broad discretion. *In re K.L.W.*, 301 S.W.3d 423, 428 (Tex. App.—Dallas 2009, no pet.). The trial court is in a better position than a reviewing court to determine what will be in the child's best interest because it observed the parties and witnesses and their demeanors and had the opportunity to assess each parent's claims. *Rubinett v. Rubinett*, No. 02-08-00021-CV, 2009 WL 1372936, at *2 (Tex. App.—Fort Worth May 14, 2009, pet. denied) (mem. op.).

We conclude that the trial court had sufficient evidence upon which to exercise its discretion in determining which parent should receive the exclusive right to determine Calvin's primary residence. Each parent testified at the trial, and although Sano complains that the trial court improperly focused on her lack

17

of driver's license, her epilepsy, and "what the trial court inferred to be an intellectual failing," there was sufficient additional evidence presented at trial and in the two social study reports for the trial court to make its decision, including testimony and evidence regarding each party's parental abilities, their plans for the child, and the child's needs. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (setting out nonexclusive list of best interest factors); *In re J.A.R.*, No. 02-04-00123-CV, 2005 WL 2839107, at *8–9 (Tex. App.—Fort Worth Oct. 27, 2005, no pet.) (mem. op.) (applying *Holley* factors in suit to modify divorce decree to appoint mother as primary managing conservator).

Further, although Sano appears to argue that the trial court had to find that her impairment met the legal definition of "disability" under the ADA to consider it,[9] nothing in the record would suggest that the ADA applies here. *See* 42 U.S.C.A. § 12101(a)(1), (3)–(4) (West 2008) (acknowledging discrimination "in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services" against persons with physical or mental

---

[9]The trial court only mentions "disability" three times: In Finding of Fact #4, the trial court states that Sano "draws a social security disability check," which is supported by the record as set out above. In Conclusion of Law #9(a), the trial court states that it considered Sano's disability as a factor in making a determination of a just and right division of the parties' community property. Sano does not appeal the portion of the judgment dividing the parties' community property. And in Conclusion of Law #11, the trial court found that Sano should not pay any child support "because she is unable to do so because of her disability," and Sano does not appeal the portion of the judgment addressing child support.

18

disabilities and implementing the ADA to provide such persons a means of legal recourse to redress such discrimination). But even assuming that the trial court had to find that Sano met the legal definition of "disability" under the ADA, it had sufficient evidence, based on Sano's own testimony recounted above, to do so. *See id.* § 12102(1)(A), (2)(A) (West 2008) (defining "disability" as "a physical or mental impairment that substantially limits one or more major life activities," and defining "major life activities" as including, but not being limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, *and working*" (emphasis added)). And while Sano argues that a parent's disability should not affect an award of custody, she supports this argument with citations to cases from other jurisdictions that do not control, apply, or favor her case on the facts here.[10] We cannot say, on the

---

[10]Sano cites *In re Marriage of Stopher*, in which the appellate court upheld a grant of permanent custody to the child's developmentally disabled mother, but the record in that case reflected that the mother, whose IQ was 67, had substantial support in caring for the child and handled some situations better than the child's father. 767 N.E.2d 925, 926–33 (Ill. App. Ct. 2002). Sano also cites *Lieurance-Ross v. Ross*, but *Ross* involved a specific Idaho statute requiring the court to make specific findings concerning a parent's disability and what effect, if any, the disability had on the child's best interest in any case where the court finds a parent's disability to be relevant to a child custody award. 129 P.3d 1285, 1290 (Idaho Ct. App. 2006). Texas has no such statutory requirement. And Sano cites *Curry v. McDaniel*, but in *Curry*, the court stated, "At the outset, *we find no persuasive authority which supports the proposition that the ADA applies or was intended to apply to child-custody determinations*," before noting that the physical and mental health of the parents is one of the factors that courts are to consider when determining whose custody would serve the child's best interest. 37 So. 3d 1225, 1233 (Miss. Ct. App. 2010) (emphasis added).

record presented here, that the trial court abused its discretion by designating Greenlee as the joint managing conservator with the right to establish the child's primary residence, and we overrule this portion of Sano's first issue.

And, although Sano argues in her second issue and in part of her first issue that her due process rights were violated by the trial court's "[b]randing" her as physically disabled and mentally diminished when it did not order assessments of her physical and mental disabilities or expert testimony to determine the extent of any disability and how it would affect her and the child, or afford her the opportunity to rebut such inferences, nothing in the record shows that Sano ever raised this complaint in the trial court. Therefore, she has failed to preserve her due process complaint for our review. *See* Tex. R. App. P. 33.1; *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993) (rejecting due process complaint when party failed to raise it at trial). We overrule Sano's second issue.

Additionally, the record is clear that the trial court did not "brand" Sano as physically disabled and mentally diminished; rather, in Finding of Fact #9, it found that she had "questionable functioning and reasoning abilities," which it could have determined based on her admission that the SSA had found that she had borderline intellectual functioning, as well as based on her testimony and demeanor at the hearing, the social study reports, and her conduct during the three years of divorce proceedings, and it could have also considered her physical disabilities—which she admitted to at the trial—with regard to her ability to care for Calvin. *See* Tex. Fam. Code Ann. § 153.134(a)(7) (stating that in

20

determining whether to appoint parents as joint managing conservators, the trial court may consider "any other relevant factor").  And Sano had the opportunity during her case-in-chief to present witnesses or other evidence to rebut the SSA's findings—which were admitted in evidence without objection by Sano—and to demonstrate that her physical and intellectual issues had no effect on her parental abilities.  We overrule the remainder of Sano's first issue.

## IV.  Conclusion

Having overruled both of Sano's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, MEIER, and GABRIEL, JJ.

DELIVERED:  June 16, 2011

21